IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| 911 MANAGEMENT, LLC, a Washington Limited Liability Company, | ) ) ) ) | No. CV-08-47-HU |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| UNITED STATES of AMERICA, | ) ) | FINDINGS & RECOMMENDATION/ ORDER |
| Defendant. | ) ) | |

Marc K. Sellers
SCHWABE, WILLIAMSON & WYATT, P.C.
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204

        Attorney for Plaintiff

Kent Robinson
ACTING UNITED STATES ATTORNEY
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2024

Lauren M. Castaldi
Charles M. Duffy
TRIAL ATTORNEYS, TAX DIVISION
United States Department of Justice
P.O. Box 683
Ben Franklin Station
Washington, D.C. 20044-0683

        Attorneys for Defendant

1 - FINDINGS & RECOMMENDATION/ORDER

1  HUBEL, Magistrate Judge:

2      Plaintiff 911 Management, LLC, a Washington limited liability

3  company, brings this wrongful levy action against the United

4  States.  Both sides move for summary judgment.  I recommend that

5  911 Management's motion be denied, and that defendant's motion be

6  granted.  911 Management also moves to strike several assertions of

7  fact in defendant's Concise Statement of Fact (CSF), and associated

8  underlying documents.  I deny the motion to strike in part and deny

9  it as moot in part.

10                           BACKGROUND

11     This case involves three levies, totaling approximately

12 $198,689, made by the Internal Revenue Service (IRS) in 2007

13 against 911 Management's bank account at U.S. Bank.  The IRS levies

14 were made to collect federal income taxes owed by Tom and Kathy

15 Weathers for tax year 1996.  The IRS asserts that 911 Management is

16 the nominee or alter ego of Tom and Kathy Weathers.

17     In February 1990, Tom and Kathy Weathers entered into a lease

18 relating to the Kent Hotel, located in Portland.  Deft Exh. 29.

19 Id. at p. 1.  Tom and Kathy Weathers, as tenants, were to operate

20 the Kent Hotel and were obligated to make lease payments to

21 landlord Georgia Katchis.  Id. at p. 2.  Tom and Kathy Weathers are

22 still parties to a lease agreement for the Kent Hotel and the

23 current landlord is Katchis, LLC.

24     The Weatherses have a second lease agreement for the Joyce

25 Hotel, also located in Portland.   The most recent lease agreement

26 for the Joyce Hotel was entered into on March 1, 2003, between Tom

27 and Kathy Weathers as Lessees and D.Z. Real Estate as Lessor.  Deft

28 Exh. 26.  Under the terms of the lease, Tom and Kathy Weathers have

2 - FINDINGS & RECOMMENDATION/ORDER

1  the right to operate the Joyce Hotel and they are obligated to make

2  payments to the Lessor.  Id.

3       On their 1993, 1994, 1995, and 1996 federal personal income

4  tax returns, Tom and Kathy Weathers reported income received from

5  operating the Kent and Joyce Hotels.  Deft Exhs. 36-39; Tom

6  Weathers Depo. (Deft Exh. 51) at pp. 16-19, 22-25.  On those same

7  personal income tax returns for 1993 through 1996, Tom and Kathy

8  Weathers also reported rents received from several properties they

9  owned in Longview and Kelso, Washington.

10      In July 1998, the Weatherses filed an amended income tax

11 return for the 1996 tax year.  Deft Exh. 39.  There, they

12 represented that they owed no federal income taxes for that year,

13 although their original return for 1996 showed they owed more than

14 $107,000 in taxes.  Id.  (Line 10, Column C); Deft Exh. 38 (Line

15 62).  Tom Weathers filed an attachment to the 1996 amended return

16 in which he made the following statements:  (1) "I know that no

17 section of the Internal Revenue Code establishes an individual or

18 personal 'income tax' liability applicable to me"; (2) "[t]here is

19 no requirement in the [Internal Revenue Code or the Regulations

20 thereunder] requiring me tofile [sic] a 1040 Income Tax Return";

21 (3) "I am a non-resident to the state of the forum of United States

22 tax laws"; and (4) "I . . . swear under penalty of perjury that I

23 have earned zero income for 1996 and all previous years."  Deft

24 Exh. 39 (Bates Stamp 149142-43).

25      On September 1, 2004, Tom and Kathy Weathers were indicted on

26 six counts of federal criminal tax violations.  Deft Exh. 44.  A

27 superseding indictment regarding the violations, including evasion

28 of payment of tax for 1996, was filed on October 27, 2004.  Deft

3 - FINDINGS & RECOMMENDATION/ORDER

1  Exh. 45.

2      The superseding indictment sets forth seven acts of alleged
3  tax evasion by the Weatherses, three of which are particularly
4  relevant here:    (1) they "plac[ed] jointly owned personal
5  properties in the names of nominees to conceal [their] ownership of
6  such properties from the IRS"; (2) they "jointly owned personal
7  properties in the names of nominees to conceal [their] ownership of
8  such properties from the IRS"; and (3) they "open[ed] bank accounts
9  in the names of nominees and deposit[ed] funds into such accounts,
10 beginning in about October 1998 and continuing through at least
11 June 2004, in order to conceal [their] ownership of the funds from
12 the IRS." Id.

13     On June 28, 2005, Tom and Kathy Weathers were convicted on all
14 six counts in the superseding indictment, resulting in convictions
15 for one count of evasion of payment of tax for tax year 1996, and
16 five counts of failure to file tax returns for the years 1998
17 through 2002. Deft Exh. 47. On September 29, 2005, Kathy Weathers
18 was sentenced to two years of probation. Deft Exh. 7. The terms
19 of her probation required that she pay restitution for tax year
20 1996, in the amount of $103,117. Id. On October 14, 2005, Tom
21 Weathers was sentenced to sixty months in prison for the tax
22 convictions. Deft Exh. 6. He was also required to pay restitution
23 for the tax year 1996 in the amount of $103,117. Id.

24     On October 25, 2005, a written application to form 911
25 Management, LLC was filed with the Washington Secretary of State's
26 Office. Deft Exh. 3. The address for 911 Management is listed as
27 201 Orchard Street, Leavenworth, Washington. Id. Bryce W. Townley
28 executed the certificate. Id. His address was the same as the

4 - FINDINGS & RECOMMENDATION/ORDER

1   LLC's. Id. The registered agency for the LLC was listed as "B &

2   C Townley, LLC," with the same address as 911 Management, LLC. Id.

3   Schedule A of the Operating Agreement for 911 Management, LLC

4   shows 911 Management to have three "members": T&K Weathers, LLP

5   (25%), Kathy Weathers (35%), and "Club Ed, Unincorporated

6   Association" (40%). Deft Exh. 8 at p. 13. The addresses for Kathy

7   Weathers and Club Ed are the same. Id.

8   Tom and Kathy Weathers are the general partners of T&K

9   Weathers, LLP, which was formed on March 27, 1996. Deft Exh. 1.

10  There are five limited partners: (1) the "Thomas D. Weathers and

11  Kathy J. Weathers Family Trust, UA DTD February 26, 1996"; (2)

12  "Brian D. Weathers Irrevocable Trust, UA DTD March 21, 1996"; (3)

13  "Katie B. Weathers Irrevocable Trust, UA DTD March 21, 1996"; (4)

14  Kayla D. Weathers Irrevocable Trust, UA DTD March 21, 1996"; and

15  (5) Bradley M. Weathers Irrevocable Trust, UA DTD March 21, 1996."

16  Id. Brian Weathers, Katie Weathers, Kayla Weathers, and Bradley

17  Weathers are the children of Tom and Kathy Weathers.

18  Tom and Kathy Weathers executed the partnership agreement for

19  T&K Weathers, LLP as general partners, and also as Trustees of the

20  limited partner family trust. Id. at p. 7. Daniel and Shirley

21  Dent signed as limited partners, with each of them signing four

22  times, but with no indication of what limited partner they were

23  signing for. Id. at p. 8.

24  Club Ed is identified in Schedule A of 911 Management, LLC's

25  Operating Agreement as an unincorporated association. According to

26  Daniel Dent, the manager of 911 Management, Club Ed is an

27  organization that provides educational benefits to its members.

28  Deft Exh. 11 (Daniel Dent Depo.) at p. 47. Club Ed has paid

5 - FINDINGS & RECOMMENDATION/ORDER

1  tuition for schooling and provided books and learning materials to

2  Katie Weathers, Kayla Weathers, David Maag, Bruce Carroll, and Tom

3  Weathers.   Id.   Dent  testified  that  these  persons  were  the

4  "members" of Club Ed.  Id. at p. 48.

5       Additional facts are discussed below.

6                           STANDARDS

7       Summary judgment is appropriate if there is no genuine issue

8  of material fact and the moving party is entitled to judgment as a

9  matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the

10  initial responsibility of informing the court of the basis of its

11  motion, and identifying those portions of "'pleadings, depositions,

12  answers to interrogatories, and admissions on file, together with

13  the affidavits, if any,' which it believes demonstrate the absence

14  of a genuine issue of material fact."  Celotex Corp. v. Catrett,

15  477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

16       "If the moving party meets its initial burden of showing 'the

17  absence of a material and triable issue of fact,' 'the burden then

18  moves to the opposing party, who must present significant probative

19  evidence tending to support its claim or defense.'"  Intel Corp. v.

20  Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991)

21  (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th

22  Cir. 1987)).  The nonmoving party must go beyond the pleadings and

23  designate facts showing an issue for trial.  Celotex, 477 U.S. at

24  322-23.  The substantive law governing a claim determines whether

25  a fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors

26  Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

27       The court should view inferences drawn from the facts in the

28  light most favorable to the nonmoving party.  Id. at 630-31.  On

6 - FINDINGS & RECOMMENDATION/ORDER

cross-motions for summary judgment, the court gives the nonmoving party for each motion the benefit of all reasonable inferences. Center for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dept., 533 F.3d 780, 786 (9th Cir. 2008). Additionally, on summary judgment, the court need not draw all possible inferences in the nonmoving party's favor, but only all reasonable ones, and a reasonable inference is one based on more than mere speculation, conjecture, or fantasy. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 n.10 (9th Cir. 2002).

All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). However, summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. In that situation, there

> can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. The standard for granting summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). . . .

Id. at 322-32 (internal quotation omitted). Additionally, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." Matsushita, 474 U.S. at 586.

/ / /

7 - FINDINGS & RECOMMENDATION/ORDER

1                           DISCUSSION

2    I.  Applicable Law

3         A.   911 Management's Claims

4         911 Management brings this action under 26 U.S.C. § 7426.  The

5    first three claims for relief are brought as to the three separate

6    levies which defendant issued against 911 Management's bank

7    account:  April 16, 2007 (first claim), October 31, 2007 (second

8    claim), and November 30, 2007 (third claim).

9         911 Management also brings a fourth claim for "Unlawful

10   'Nominee Levies' by Defendant upon Plaintiff's Property."  Compl.

11   at ¶¶ 51-70.  911 Management alleges that before assessing a tax

12   against a taxpayer, the IRS is required to present the taxpayer

13   with notice and an opportunity to dispute the proposed tax in a

14   proceeding in the United States Tax Court.  26 U.S.C. § 6213(a).

15   This is referred to as a "notice of deficiency."  26 U.S.C. § 6212.

16   911 Management alleges that no statute relieves defendant of the

17   notice requirements where the defendant seeks to assess a tax

18   liability against an alleged nominee or alter ego of a taxpayer.

19   Compl. at ¶ 54.  911 Management asserts that before assessing a tax

20   against 911 Management, even as an alleged nominee or alter ego of

21   another person, defendant was required to issue a notice of

22   deficiency to 911 Management.  Id. at ¶ 55.  911 Management also

23   alleges that before assessing the taxes at issue in its first three

24   claims, defendant provided no notice of deficiency to 911

25   Management.  Id. at ¶ 56.  911 Management further alleges that

26   defendant was similarly obligated to provide 911 Management with

27   notice that defendant intended to collect the tax forcibly by

28   issuing to 911 Management a "notice of intent to levy."  Id. at ¶¶

8 - FINDINGS & RECOMMENDATION/ORDER

58-63 (citing 26 U.S.C. § 6330).

B.  Wrongful Levy under 26 U.S.C. § 7426

26 U.S.C. § 7426 allows a third party (a party other than the delinquent taxpayer or the IRS), to challenge an IRS levy as "wrongful."  Under IRS regulations, a levy is "wrongful," if it "is upon property in which the taxpayer had no interest at the time the lien arose or thereafter."  26 C.F.R. § 301.7426-1(b).

As explained in a 1997 decision by this Court:

> When a taxpayer neglects or refuses to pay taxes, the IRS may place a lien in favor of the United States upon all property and rights to property belonging to the taxpayer.  26 U.S.C. § 6321.  When a lien attaches to property it is subject to levy.  26 U.S.C. § 6331(a). Under certain circumstances, the United States may levy upon property held by a third party such as, when a third party trust or entity is the alter ego or nominee of a taxpayer who is indebted to the United States for past taxes and penalties, See Juris Trust Co. Ltd. V. United States, 1996 WL 784503 (E.D. Cal. 1996), when a trust or entity is a "sham", See United States v. Geissler, 1993 WL 625535 (D. Idaho 1993), or when the third party's interest in the property derives from a fraudulent transfer by the taxpayer whose liabilities are at issue, See Loving Saviour Church v. United States, 728 F.2d 1085, 1086 (8th Cir. 1984).

> 26 U.S.C. § 7426(a)(1) provides in part that: "If a levy has been made on property . . ., any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in . . . such property and that such property was wrongfully levied upon may bring a civil action against the United States . . .".  To state a claim under § 7426, the plaintiff must show: 1) it has an interest in the property; and 2) the "property was wrongfully levied upon".  26 U.S.C. § 7426(a)(1).  A levy is wrongful if it was placed upon property in which the delinquent taxpayer has no interest.  Sessler v. United States, 7 F.3d 1449, 1451 (9th Cir. 1993).

> The plaintiff "has the initial burden of proving title to the levied property."  Tri-State Equipment v. United States, 1997 WL 375264 at *9 (E.D. Cal. 1997). Once the plaintiff meets this initial burden, "the United States must show that there is a nexus between the taxpayer and the property."  Id.  The United States may satisfy this burden by showing that a third party trust

1  or entity is the alter ego or nominee of a taxpayer who
2  is indebted to the United States for past taxes and
   penalties, See Juris Trust Co. Ltd. V. United States,
3  1996 WL 784503 (E.D. Cal. 1996), a third party trust or
   entity is a "sham", See United States v. Geissler, 1993
4  WL 625535 (D. Idaho 1993), or the third party's interest
   in the property derives from a fraudulent transfer by the
5  taxpayer whose liabilities are at issue, See Loving
   Saviour Church v. United States, 728 F.2d 1085, 1086 (8th
6  Cir. 1984). "[T]he plaintiff bears the ultimate burden
   of proving that the property does not belong to the
7  taxpayer." Tri-State Equipment, 1997 WL 375264 at *9.

The Colby B. Foundation v. United States, No. CV-96-3073-CO, 1997

WL 1046002, at *16-17 (D. Or. Oct. 22, 1997), aff'd, 166 F.3d 1217

(9th Cir. 1999); see also D & S Family Preservation Trust v. United

States, 983 F. Supp. 926, 930 (D. Or. 1997) ("The plaintiff in a

wrongful levy suit bears the initial burden of showing an interest

in, or a lien on, e.g., legal title, in the levied upon property.

. . . Once that showing is made, the burden shifts to the

government to show a nexus between the taxpayer and the property.

. . . The plaintiff, however, retains the ultimate burden of

persuading the district court that the property which appears to

belong to the taxpayer is actually his property") (citations

omitted).

    911 Management argues that the burden of proof on the "nexus"

element resides with the government and does not shift back to 911

Management.  In support, 911 Management relies on Flores v. United

States, 551 F.2d 1169 (9th Cir. 1977), where the court held that

the government has the burden of persuasion on the "nexus" issue.

Id. at 1175.  Because the government in Flores failed to introduce

sufficient evidence supporting its claim that the money which had

been seized belonged to the delinquent taxpayer, the court had no

reason to expressly consider the issue of shifting the burden back

1   to the plaintiff upon the government providing sufficient evidence
2   in support of its claim.  See id. at 1176.

3       In a footnote, the Flores court noted that it was not faced
4   with a situation in which the government meets its burden of
5   demonstrating a nexus between the taxpayer and the seized property
6   where the plaintiff makes a claim to the property "derivatively
7   from the taxpayer, through gift or otherwise."  Id. at 1176 n.8.
8   The court stated that such a situation was different from the case
9   before it, and that its holding was limited to a requirement that
10  the government "trace the property to the taxpayer."  Id.

11      Subsequently, in a 1984 decision, the Ninth Circuit remarked
12  that in Flores, it held that the government had the burden of
13  persuasion on the question of whether there was a nexus between the
14  taxpayer and the seized property.  Arth v. United States, 735 F.2d
15  1190, 1193 (9th Cir. 1984).  The court expressed that it had "no
16  doubt" that the government met that burden in the case before it.
17  Id.

18      The Arth court noted that Flores had "reserved the question of
19  where the burden of proof lies once the government traces the
20  property of the taxpayer and the third party makes a claim to the
21  property derivatively from the taxpayer, through gift or
22  otherwise."  Id. at 1193.  The Arth court was "faced with such a
23  situation here."  Id.  In such a circumstance, the court held, the
24  third party must "prove that property which appears to belong to
25  the taxpayer is actually his."  Id.  The court reached this
26  conclusion because on the "nexus" issue, the government will often
27  have greater access to the facts than the third party, while in the
28  situation of a derivative claim, the third party makes "a claim of

11 - FINDINGS & RECOMMENDATION/ORDER

1  ownership which depends on facts that are peculiarly within his
2  knowledge." Id.

3      911 Management contends that this case is governed by Flores
4  and not Arth. The problem with 911 Management's argument, however,
5  is that Flores does not require the shifting of the burden of
6  proof, but only requires that the government carry the burden of
7  persuasion on the nexus issue, and neither case provides the law
8  regarding the burden of proof, or persuasion, once the government
9  meets its burden on the nexus issue in a case not involving a
10  derivative claim.

11      Moreover, contrary to 911 Management's argument, Judge
12  Panner's decision in Morgan Overseas Bank, Ltd. v. United States,
13  No. CV-84-797-PA, 1986 WL 10102 (D. Or. June 17, 1986), does not
14  resolve the issue. There, Judge Panner noted that there was some
15  question in the law as to whether the burden of showing the nexus
16  element was ultimately on the plaintiff or the government. Id. at
17  *1. He first cited Valley Finance, Inc. v. United States, 629 F.2d
18  162, 171 n. 19 (D. C. Cir. 1980), for the proposition that once the
19  government meets its burden of showing the requisite nexus, the
20  burden returns to the plaintiff who must show wrongfulness by a
21  preponderance of the evidence. Id. Then, however, he noted that
22  dictum in Flores and Al-Kim v. United States, 610 F.2d 576, 580
23  (9th Cir. 1979), amended, 650 F.2d 944, 948 n.12 (9th Cir. 1981),
24  indicated that the burden may remain with the government. Id.

25      Judge Panner then discussed Arth and Flores. Id. at *2. He
26  concluded that the case before him was governed by Arth because
27  even though the plaintiff did not contend that it received the
28  seized property derivatively from the taxpayer, the evidence

12 - FINDINGS & RECOMMENDATION/ORDER

1  indicated that that is what had occurred.  Id. at *2.  Thus, Judge

2  Panner applied the standard for derivative property as articulated

3  in Arth.  Finally, after a review of the evidence and making

4  findings of fact, he concluded that the evidence showed a close

5  nexus between the plaintiff and the delinquent taxpayer.  Id. at

6  *10.  He explained that he would reach that result on the nexus

7  element and make the same fact findings whether the burden rested

8  on the plaintiff or the government.  Id.

9      I agree with 911 Management that Flores governs this case, as

10  far as it goes.  After 911 Management makes its initial showing of

11  an interest in the property, the burden of persuasion shifts to the

12  government to show a nexus between the property and the taxpayer.

13  Flores does not expressly answer the question of what occurs,

14  absent a derivative claim to the property, once the government

15  satisfies this burden.  But, by holding that only the burden of

16  persuasion shifts to the government on the nexus element, Flores

17  impliedly holds that once the government meets its burden on that

18  issue, the burden of persuasion shifts back to 911 Management and

19  that ultimately, 911 Management bears the burden of proving that

20  the property does not belong to the Weatherses.

21      Applying that principle to the cross-motions for summary

22  judgment in this case, 911 Management, to prevail on its motion,

23  must establish, in the end, that no reasonable juror could conclude

24  that the money in the account levied upon belonged to the

25  Weatherses.  To avoid summary judgment in favor of the government,

26  911 Management must establish that a reasonable juror could

27  conclude that the money in the account did not belong to the

28  Weathers.  If 911 Management fails in this regard, summary judgment

13 - FINDINGS & RECOMMENDATION/ORDER

1   must be granted to the government.

2       C.  Nominee Law

3       State law controls the determination of whether an entity is

4   an alter ego or nominee. Colby B., 1997 WL 1046002, at *20 (citing

5   Morgan Overseas Bank, 1986 WL 10102, at *10). Although Oregon law

6   recognizes the nominee theory, it does not address the factors

7   necessary to determine whether an entity is the nominee of the

8   taxpayer.    Id.    Thus, as in Colby B., the court looks to the

9   nominee factors identified in Towe Antique Ford v. IRS, 791 F.

10  Supp. 1450, 1454 (D. Mon. 1992), aff'd, 999 F.2d 1387 (9th Cir.

11  1993) (affirming on alter ego issue, but declining to reach nominee

12  issue). Colby B., 1997 WL 1046002, at *20; see also United States

13  v. Secapure, No. C 07-1050 THE, 2008 WL 820719, at *7 (N. D. Cal.

14  Mar. 26, 2008) (noting that courts throughout the Ninth Circuit

15  rely on the Towe factors to determine nominee status).

16      The Towe factors are:

17      1) Whether the nominee paid no or inadequate consideration;

18      2) Whether the property was placed in the name of the nominee

19  in anticipation of litigation or liabilities;

20      3) Whether there is a close relationship between the

21  transferor and the nominee;

22      4) Whether the parties to the transfer failed to record the

23  conveyance;

24      5) Whether the transferor retained possession; and

25      6) Whether the transferor continues to enjoy the benefits of

26  the transferred property.

27  Towe, 791 F. Supp. at 1454.

28      The Colby B. court added four additional factors relevant to

14 - FINDINGS & RECOMMENDATION/ORDER

1  the nominee analysis, although they were not articulated in <u>Towe</u>:

2  (1) the source of the funds used to purchase the property; (2) the

3  taxpayer's continued use of the property without payment of fair

4  rental value; (3) the taxpayer's continued payment of maintenance

5  charges and real estate taxes; and (4) the taxpayer's acts of

6  holding himself out as the owner of the property. <u>Colby B.</u>, 1997

7  WL 1046002, at *20.

8       Generally, a business holds an asset as a nominee for a

9  taxpayer when the taxpayer maintains a beneficial interest and

10  exerts control over the asset. <u>See</u> <u>LiButti v. United States</u>, 107

11  F.3d 110, 119 (2d Cir. 1997). The court should consider the

12  totality of the circumstances rather than single out the presence

13  or absence of one particular factor. <u>See</u> <u>Turk v. IRS</u>, 127 F. Supp.

14  2d 1165, 1167 (D. Mont. 2000) ("No factor can dispose of the issue

15  itself, and no factor is necessarily required in order to find

16  nominee status.").

17       D.  Alter Ego Law

18       As with the law regarding nominees, Oregon law controls the

19  issue of alter ego. <u>Wolfe v. United States</u>, 806 F.2d 1410, 1411

20  n.3 (9th Cir. 1986); <u>Morgan Overseas Bank</u>, 1986 WL 10102, at *10.

21  Oregon has recognized the alter ego theory, but it has not

22  specifically addressed the issue in the tax context. <u>Morgan</u>

23  <u>Overseas Bank</u>, 1986 WL 10102, at *10.

24       In <u>Towe</u>, the Ninth Circuit discussed the alter ego theory

25  under Montana law. <u>Towe</u>, 999 F.2d at 1391. It explained that in

26  Montana, "no concrete formula exists under which a court will

27  disregard the separate identity of the corporate entity." <u>Id.</u>

28  (internal quotation omitted). The court then listed the following

15 - FINDINGS & RECOMMENDATION/ORDER

factors as relevant to a finding of alter ego:

1) Whether the individual is in a position of control or authority over the entity;

2) Whether the individual controls the entity's actions without need to consult others;

3) Whether the individual uses the entity to shield himself from personal liability;

4) Whether the individual uses the business entity for his or her own financial benefit;

5) Whether the individual mingles his own affairs in the affairs of the business entity; and

6) Whether the individual uses the business entity to assume his own debts, or the debts of another, or whether the individual uses his own funds to pay the business entity's debts. Id. The court noted that these factors were not exclusive. Id. The court also suggested the alter ego determination depends on the facts and circumstances present in each case. Id.

In Valley Finance, a case cited by the Towe court on the issue of alter ego status, the court stated that an entity is an alter ego when it is so dominated by another so as to negate any separate entity distinction. Valley Finance, 629 F.2d at 171-172 (cited in Towe, 999 F.2d at 1391). The Valley Finance court explained that "control by the individual must be active and substantial, but it need not be exclusive in a hypertechnical or day-to-day sense. The test is a practical one, based largely on a reading of the particular factual circumstances." Id. at 172.

/ / /

/ / /

16 - FINDINGS & RECOMMENDATION/ORDER

II.  Discussion

    A.  Nominee Factors

Colby B. and Towe together provide ten factors to analyze to determine whether an entity is the nominee of a taxpayer. Importantly, as suggested by the cases cited above, the factors are flexible, meaning that in a case involving the seizure of cash in a bank account, as opposed to the seizure of real property, some of the factors may not be readily applicable. And, depending on the facts of the case, the factors as stated in Colby B. or Towe, may need to be rephrased. Finally, as recited above, the presence or absence of a particular factor is not dispositive.

        1.  Whether the Nominee Paid No or Inadequate Consideration

On September 28, 2007, 911 Management entered into written license agreements with Tom and Kathy Weathers regarding the operations at the Kent and Joyce Hotels. Deft Exhs. 12, 13. The agreements are identical, but for the individual hotel.

In the Joyce Hotel agreement, Tom and Kathy Weathers are defined as the Licensor and 911 Management, LLC is defined as the Licensee. Deft Exh. 12. The License Agreement initially states that the Weatherses, as Licensor, and 911 Management, as Licensee, have been operating under a "binding verbal, legal agreement" from January 1, 2006, with respect to the management and operations of the Joyce Hotel and that the parties desire to memorialize the prior agreement. Id. The parties recite that the written license agreement was delayed due to litigation between the Licensor and the United States. Id. The License Agreement then recites that the Licensee has managed and operated the Joyce Hotel pursuant to

17 - FINDINGS & RECOMMENDATION/ORDER

1   the License Agreement since January 1, 2006, "including collection

2   of all revenue and payment of all expenses." _Id._

3       The License Agreement recites that Licensor (the Weatherses)

4   entered into a lease agreement with DZ Real Estate, LLC, dated

5   March 1, 2003, to occupy the premises at 322 S.W. Eleventh Ave in

6   Portland, referred to as the Property, and to operate the hotel

7   business known as the Joyce Hotel. _Id._ The parties expressly

8   recognized that the License Agreement did not transfer rights and

9   ownership in or to the lease, nor did the License Agreement assign,

10  sublet, or cause an occupant change with the lease. Under the

11  License Agreement, the Licensee may not enter into any contract,

12  agreement, or commitment without prior written permission.

13      911 Management, as Licensee, confirmed that it (1) had a copy

14  of the Operating Lease between the Weatherses and DZ Real Estate,

15  (2) had read the Operating Lease, (3) agreed to use diligence and

16  its expertise to insure that strict compliance with the Operating

17  Lease was maintained, and (4) had a fundamental duty to manage and

18  operate the hotel in a compliant manner to maximize rentals, sales,

19  and profits. _Id._ at p. 2.

20      The Weatherses acknowledged and agreed that they would not

21  interfere with the management and operations of the property,

22  providing that the 911 Management maintained full compliance with

23  the Operating Lease and the License Agreement. _Id._ at pp. 2-3.

24  However, the termination provision states that the Weatherses, as

25  Licensor, can terminate the License Agreement at any time without

26  cause by providing notice to the Licensee in writing. _Id._ at p. 3.

27  911 Management, as Licensee, has no corresponding right to

28  terminate the License Agreement.

18 - FINDINGS & RECOMMENDATION/ORDER

1    In the License Agreement, Kathy Weathers disclosed that she
2    was a minority owner of 911 Management.  Id.  The License Agreement
3    recites that she will assist 911 Management as directed by manager
4    Dent, but that she would not control or direct any management,
5    fiscal duties, or key operating activities of 911 Management.  Id.

6    The License Agreement requires that 911 Management, as
7    Licensee, pay the Weatherses, as Licensor, a fee equal to three-
8    percent of the gross proceeds generated from operations, interest,
9    late fees, sales, rentals and any and all other income derived from
10   the property and/or hotel operations.  Id. at p. 5.  This fee was
11   to be paid by the tenth day of each month.  Id.  The Licensee is
12   directed to make the fee payment to Tom and Kathy Weathers unless
13   otherwise directed by the Licensor.  Id.

14   The License Agreement is signed by Tom and Kathy Weathers as
15   Licensors, and by Dent for the Licensee.  Id. at p. 8.    An
16   identical License Agreement between Tom and Kathy Weathers as
17   Licensor and 911 Management as Licensee, regarding the operation of
18   the Kent Hotel, was executed on the same day, by the same
19   individuals.  Deft Exh. 13.

20   911 Management also receives income from the management of
21   several properties in Washington.  The initial capital contribution
22   to T&K Weathers, LLP, one of 911 Management's members, in 1996,
23   included several properties owned by Tom and Kathy Weathers in
24   Longview and Kelso, Washington.  Deft Exh. 1.  Schedule A of the
25   T&K Weathers, LLP partnership agreement states that "[t]he
26   following real estate subject to the encumbrances owed thereon to-
27   wit: [list of seven properties.]  The above-described real estate
28   is hereby conveyed to said TK WEATHERS LIMITED PARTNERSHIP, with

19 - FINDINGS & RECOMMENDATION/ORDER

1    Grantors retaining the obligation to personally pay all obligations

2    thereon if any presently exist."  Id.[1]

3         According to Dent, 911 Management manages the Longview and

4    Kelso properties under an oral agreement with Tom Weathers, as

5    general partner of T&K Weathers, LLP.[2]  Deft Exh. 11 (Dent Depo.)

6    at p. 68; see also Deft Exh. 51 (Tom Weathers Depo.) at p. 47 (any

7    properties held by T&K Weathers are managed by 911 Management).

8    911 Management receives income from the management of the

9    Washington properties in exchange for paying the mortgages on those

10   properties.

11        Tom and Kathy Weathers did not personally place money in 911

12   Management's bank account.  This is not a situation where a sales

13   contract reveals the consideration paid for seized property.  The

14   money seized in 911 Management's bank account was there by virtue

15   of two sets of agreements.  The first set is the written License

16   Agreements Tom and Kathy Weathers signed with 911 Management to

17   operate the Kent and Joyce Hotels, which allowed 911 Management to

18   collect the revenue from those enterprises.  The second set is the

19   oral agreements the Weatherses, as general partners of T&K

20

21        [1] All of the seven properties listed on Schedule A of the
     T&K Weathers, LLP Partnership Agreement as initial capital
22   contributions, are properties which were noted as being owned by
     Tom and Kathy Weathers in their 1993-1996 tax returns as rental
23   property.  However, one property listed in Schedule A of the T&K
     Weathers Partnership Agreement is listed as 1003 Chesnut in
24   Kelso, while the tax returns show that as 1006 Chesnut in Kelso.
     Also, the property in Schedule A at 2107 42nd Ave in Longview
25   appears only in the 1995 and 1996 tax returns, not those for 1993
     and 1994.
26

27        [2] I make no determination as to whether the oral agreement
     for management of the Washington properties is subject to the
28   statute of frauds.

20 - FINDINGS & RECOMMENDATION/ORDER

Weathers, LLP, had with 911 Management under which 911 Management operated, and received revenue from, the Washington properties. Thus, the relevant inquiry for this case, under this factor, is whether 911 Management paid little or no consideration for the right to obtain the revenue from those Oregon hotels and Washington properties as a result of operating them.

911 Management reported gross receipts of $1,379,749 on its 2006 federal income tax return (IRS Form 1065, line 1(a)). Deft Exh. 9. It reported gross receipts of $1,510,131 on its 2007 federal tax return (IRS Form 1065, line 1(a)). Deft Exh. 10. According to Dent, 911 Management's sole source of income is the rental of rooms in the Kent and Joyce Hotels in Oregon, and the rental of the Washington properties. Dent Feb. 20, 2009 Affid. at ¶ 5.

Other than some vague entries in 911 Management's bank account records which may be deposits of income from the hotels or the Washington properties[3], but which are not identified by either party as such (nor is there any citation to a particular page or entry in the more than seventy-page exhibit), there is no evidence in the record to show how much of the gross receipts listed on 911 Management's 2006 and 2007 tax returns, is attributable to an individual piece of property. Thus, on this record, I cannot

---

[3] 911 Management's bank account records show fairly regular deposits of "Portland Inco..." E.g., Exh. B to Sellers Affid. at p. 33 (Jan. 17, 2006 deposits of $4,714.30, and $6,171.27), p. 56 (Aug. 28, 2006 deposits of $8,907.76, and $5318.55). Neither party provides an explanation of the nature of these deposits. Without more, it would be inappropriate speculation to assume that they represent all gross proceeds of the Joyce and Kent Hotels.

21 - FINDINGS & RECOMMENDATION/ORDER

discern how much gross income 911 Management obtained from its operation of only the Joyce Hotel, its operation of only the Kent Hotel, or its operation of any of the individual properties in Washington.

As a result, the record does not establish the amount represented by three-percent of the gross proceeds from the operation of the hotels. Thus, there is no way to evaluate whether the three-percent fee under the License Agreements for the Kent and Joyce Hotels was a fair bargain for 911 Management or the Weatherses. Additionally, plaintiff fails to put any evidence in the record to show how this three-percent fee compares to other, similar commercial license agreements.

Nor is it possible to compute the value of the oral agreement for the Washington properties. Again, the record does not show the amount of gross proceeds generated by those properties. It also does not show the amount 911 Management pays in mortgage payments on those properties. Thus, as with the hotels, the record does not allow the Court to evaluate the adequacy of consideration paid by 911 Management, the alleged nominee here, for the right to obtain income from the hotels and the Washington properties.

Records from 1996, while not determinative, give some indication that the three-percent license fee under the hotel agreements, is wholly inadequate consideration. In 1996, the Joyce Hotel collected $405,660 in rent. Deft Exh. 38 at Bates 010838. Three-percent of $405,660 is $12,129. Net income from the Joyce Hotel in 1996 is listed in the Weatherses' 1996 tax return as $134,761. Id. Thus, if the License Agreement had been in place in 1996, the Weatherses would have received $12,169 from 911

22 - FINDINGS & RECOMMENDATION/ORDER

1    Management, but would have given up $134,761 in income in exchange,
2    meaning they would have given up more than ninety-percent of the
3    income from the Joyce Hotel.

4        As for the Kent Hotel, the gross rents for 1996 were $195,353,
5    three-percent of which is $5,860.59. Deft Exh. 38 at Bates 010839.
6    The net income for the property for that year was $96,824. Id.  If
7    the License Agreement had been in place in 1996, the Weatherses
8    would have received $5,860.59 as the three-percent fee owed to
9    them, but would have given up $96,824 as net income, meaning they
10   would have given up over ninety-three percent of the income from
11   the Kent Hotel.

12       The evidence is insufficient to evaluate the adequacy of the
13   consideration.  The government has met its burden of showing a
14   nexus between the income and the Weatherses because before 911
15   Management formed, and before the inception of the agreements
16   between 911 Management and the Weatherses as to the hotels, and the
17   agreement between 911 Management and T&K Weathers, LLP as to the
18   Washington properties, Tom and Kathy Weathers received the income
19   from all of the properties which now generate the income received
20   by 911 Management.[4]

21   _____

22       [4] There is no tax return in the record for T&K Weathers,
     LLP. It is unclear exactly how income received by T&K Weathers,
23   LLP was distributed among its general and limited partners.
     However, Tom and Kathy Weathers were the two general partners,
24   and the Thomas Weathers and Kathy Weathers Family Trust is one of
     the limited partners.  The other four limited partners are the
25   irrevocable trusts in each of the Weatherses' children's names.
     At the time T&K Weathers, LLP was formed, in 1996, each of the
26   children was still claimed as a dependent by Tom and Kathy
     Weathers on their individual tax return.  Deft Exh. 1 (T&K
27   Weathers, LLP Limited Partnership Agreement); Deft Exh. 38 (1996
     tax return of Tom and Kathy Weathers).  Thus, Tom and Kathy
28

23 - FINDINGS & RECOMMENDATION/ORDER

1    In the context of these motions, the government must show, on

2   this issue, only a question as to whether the consideration was

3   inadequate.  The failure of evidence on the consideration issue is

4   enough to raise such a question.  That is, the lack of evidence as

5   to what income each property generated and what the mortgage

6   payments are for the Washington property, is enough to raise a

7   question of inadequate consideration.  The information in the

8   record from 1996 further raises an issue of inadequacy.  In

9   contrast, 911 Management has to affirmatively show that the

10  consideration was adequate, or at least raise an issue that it was

11  adequate.  The complete failure of evidence on this issue, an issue

12  on which 911 Management ultimately bears the burden of proof, is

13  insufficient to suggest that the consideration was adequate.  Thus,

14  this factor weighs in favor of the government.

15              2.   Whether the Property was Placed in the Name of
                     the Nominee in Anticipation of Litigation or
16                   Liabilities

17   The basis for the tax evasion conviction was the Weatherses'

18  failure to pay income taxes on, and their efforts to conceal,

19  income earned in 1996 from the hotel operations and other

20  properties.  As noted above, as part of their sentences, Tom and

21  Kathy Weathers were ordered to immediately pay their still-

22  outstanding 1996 income tax liability.

23   911 Management was created eleven days after Tom Weathers was

24  sentenced.  911 Management and Tom and Kathy Weathers entered into

25  oral agreements on January 1, 2006, just over two months after Tom

26  ───────────────

27  Weathers personally benefitted from income to T&K Weathers, LLP,
    regardless of how the money received by T&K Weathers, LLP was
28  actually distributed.

24 - FINDINGS & RECOMMENDATION/ORDER

Weathers was sentenced, under which 911 Management began to operate the Oregon hotels and collect the revenue from those operations. The oral agreements were reduced to writing in September 2007.

Defendant argues that the timing of 911 Management's creation shows that the Weatherses sought to continue their pattern of concealing their income from the IRS, despite their criminal convictions. At sentencing, the Weatherses knew they would be required to make payments of the already-assessed 1996 tax year liability, to file tax returns, to pay taxes for future years, and to report their income to the IRS as part of their sentences. The properties which produced the 1996 income which the Weatherses took affirmative steps to conceal from the IRS, and on which they failed to pay taxes and now owed as part of a criminal restitution judgment, were the same properties which 911 Management operated under agreements with the Weatherses.

911 Management responds that the undisputed facts are that Coral Management formerly managed the properties now managed by 911 Management. During his criminal trial, Tom Weathers met Jeff Townley who recommended that a new "business structure" be implemented for management of the properties, because of Tom Weathers's impending incarceration. 911 Management contends that Jeff Townley did nothing more than overhaul a "unitary corporate structure" and replace it with a "modern LLC structure." Because businesses are restructured every day, the fact that 911 Management was formed when it was is not a basis to disregard 911 Management's separate existence and its ownership of its property.

911 Management notes that the question in this factor is whether "the property" was placed in 911 Management's name in

25 - FINDINGS & RECOMMENDATION/ORDER

anticipation of litigation or liabilities.  911 Management argues that the property here is its bank account.  911 Management further argues that the money was not placed in 911 Management's bank account by the Weatherses.  Rather, according to 911 Management, it was earned by 911 Management as a result of its operation of the properties.  Thus, 911 Management argues, the revenue cannot be characterized as having been placed in the bank account in anticipation of litigation or liabilities.

911 Management's argument ignores the facts of the case and is an unjustifiable attempt to narrow the Court's focus.  The relevant facts here are that (1) the Weatherses had a history of non-payment of taxes on income derived from the Oregon hotels and Washington properties; (2) they had recently been convicted of tax evasion for 1996; (3) they owed taxes on their 1996 income as part of a criminal judgment; (4) 911 Management was created only eleven days after Tom Weathers was sentenced; (5) the oral agreements under which 911 Management was to begin receiving the revenue from the Oregon hotels were entered into only two and one-half months after Tom Weathers was sentenced; and (6) the revenue obtained by 911 Management under the hotel agreements and the oral agreement regarding the Washington properties, is the same revenue which produced the 1996 income upon which the Weatherses' 1996 income tax assessment was based.

The evidence shows that the Weatherses created 911 Management and then entered into agreements under which income previously received by the Weatherses, would now be received by 911 Management.  The evidence shows that the Weatherses did so shortly after their convictions and sentencings for criminal tax evasion of

26 - FINDINGS & RECOMMENDATION/ORDER

$103,117 for tax year 1996 (Count 1 of the superseding indictment), and for which their Judgments of Conviction, filed on the Weatherses' respective sentencing dates, included an order of restitution requiring payment of that $103,117 to the IRS's Collection Division.  A reasonable juror could reach only one conclusion based on these facts:  the Weatherses acted in anticipation of the collection of the 1996 tax liability.

       3.   Whether There is a Close Relationship Between the Transferor and the Nominee

Defendant argues that all ownership interests in 911 Management can be traced back to the Weatherses.  The record supports defendant's argument.

The three members of 911 Management are Kathy Weathers, T&K Weathers, LLP, and Club Ed.  Tom and Kathy Weathers are the general partners of T&K Weathers, and all the limited partners are linked to the Weathers family.  It is undisputed that Tom Weathers makes the decisions for T&K Weathers, LLP.  Tom Weathers Depo. (Deft Exh. 51) at p. 34.

According to Dent, Club Ed's members are anyone that Club Ed makes a payment to, or on behalf of, and of the five such individuals he named, three are members of the Weathers family. The others are Tom Weathers's cellmate (Carroll), and Dent's nephew (Maag).  Dent has been a close personal friend of the Weatherses for more than twenty years and is the godfather of the Weathers children.  Club Ed uses the same address as Kathy Weathers and has no bank account of its own.  It does not make its own "member distributions."  Instead, 911 Management makes payments to third parties on behalf of Club Ed or its members.

27 - FINDINGS & RECOMMENDATION/ORDER

1    911 Management argues that the presence of Club Ed is
2    dispositive evidence of a "lack of closeness."  911 Management
3    relies on the testimony of Jeff Townley who indicated that while
4    Dent makes recommendations on the distributions to or on behalf of
5    Club Ed members, and executes those distributions, the final
6    decisionmaker is actually Jeff Townley.  Because there is no
7    evidence, argues 911 Management, that Jeff Townley is controlled by
8    the Weatherses, there is no evidence that the Weatherses control
9    Club Ed.  911 Management adds that should Club Ed be dissolved,
10   neither the Weatherses, nor any other individual, will have an
11   interest in Club Ed's assets.

12       The evidence undermines 911 Management's argument.  First,
13   putting Club Ed aside, the undisputed evidence is that Kathy
14   Weathers has a thirty-five percent interest in 911 Management and
15   T&K Weathers, LLP has an additional twenty-five percent interest in
16   911 Management.  As noted earlier, T&K Weathers, LLP's general
17   partners are Tom and Kathy Weathers, and their family trust is one
18   of the limited partners.  Trusts for each of their four children
19   comprise the remaining limited partners.  Thus, even with no
20   consideration of Club Ed, Tom and Kathy Weathers have a close
21   relationship to 911 Management.

22       Second, the facts regarding Club Ed support only one
23   reasonable inference:  Club Ed and Tom and Kathy Weathers have a
24   close relationship, underscoring the closeness of the relationship
25   between 911 Management and Tom and Kathy Weathers.  Dent, Club Ed's
26   manager, is closely tied to the Weatherses.  Weathers family
27   members comprise the majority of the recipients of Club Ed
28   distributions.  A cellmate of Tom Weathers's and Dent's nephew are

the only other recipients of Club Ed monies.  While there is a dispute between Dent's testimony and Jeff Townley's testimony about who is the final decisionmaker for Club Ed distributions, it appears undisputed that Townley has never failed to follow Dent's recommendations in that regard.  And, both of these decisionmakers have ties to Tom Weathers, one by being a close family friend for many years and the appointed manager of 911 Management, the other being a business advisor to Tom Weathers.  Finally, the record fails to establish that Club Ed has any assets, so the fact that the Weatherses would have no ownership interest in Club Ed assets upon dissolution of Club Ed, is meaningless.  Whatever else Club Ed may be, the record shows it is nothing more than a funnel through which money passes to people with a close relationship to Tom and Kathy Weathers.

      This factor weighs heavily in favor of the government.

      4.    Whether the Parties to the Transfer Failed to
            Record the Conveyance

      This factor is aimed at examining whether the parties formally adhered to certain recordkeeping practices in executing their transaction.  In this case, the legitimate, separate identity of 911 Management cannot be measured by a recorded conveyance or written contract of sale because there was no transfer of land or other item of tangible property.  While there are some written agreements (the written Operating Agreement for 911 Management and the written License Agreements for the hotels), there is no written conveyance record or sales contract evidencing an arms-length transaction.

      However, there is evidence as to 911 Management's

29 - FINDINGS & RECOMMENDATION/ORDER

recordkeeping practices in various instances.   This evidence is relevant to the inquiry regarding the legitimacy of the transaction between the alleged nominee and the taxpayer.

911 Management states that its bank transactions are recorded in its bank account statements and canceled checks.   While this appears to be the case, see Exh. B to Sellers Affid. at pp. 33-105, there are instances in which 911 Management's recordkeeping is sloppy or inaccurate, as discussed below.   I separately discuss the different instances of allegedly poor recordkeeping, after which I reach a conclusion about the recordkeeping evidence.

### a.  Promissory Notes

The record contains copies of nine promissory notes, all evidencing transfers of money by 911 Management to a Weathers family member, with the Weathers family member promising to repay the money under the terms of the note.   Exh. B to Sellers Affid. at pp. 106-31.  One note is dated October 12, 2006, id. at pp. 115-17, and the rest are dated at various times in 2007.   Id. at pp. 106-14, 117-30.

In November 2007, Jeff Townley sent an email to Dent attaching two of the promissory notes.   Deft Exh. 65.  Jeff Townley states that one was for Bradley Weathers who borrowed $2,800 "last January."  Deft Exh. 65.[5]  Jeff Townley further states that he was told that Bradley Weathers could not make more than a $100 per

---

[5]  The record contains a copy of a promissory note executed by Bradley Weathers in favor of 911 Management for $2,800.   Exh. B to Sellers Affid. at pp. 106-08.  It states that monthly payments were to begin on December 1, 2007, along with the first interest payment of $99.48.   Id.  The term of the note was thirty months.  Id.  A handwritten note at the bottom of the last page of the note states "Paid $250 2/13/08."   Id.

30 - FINDINGS & RECOMMENDATION/ORDER

month payment and Townley did not know what the terms were or if Bradley Weathers had started repaying the loan.  <u>Id.</u>  Townley set the interest rate at five-percent (which he describes as "quite low for a car"), and the monthly payment at $99.48/month, making it a thirty-month loan.  <u>Id.</u>  He tells Dent that

> [i]f [Bradley Weathers] has not started yet, you can fill in the date when he ought to start and treat the time from when he received the money until when he begins to repay as a grace period.  If he has already started the pay-back, fill in the date so as to reflect when he began to repay.

<u>Id.</u>

The other promissory note Jeff Townley refers to is one by Ron King, identified by Dent as Katie Weathers's husband.  Deft. Exh. 65; Dent Depo. at p. 169.[6]  Jeff Townley states that "[t]he other note is for Ron King.  I just made it a simple interest 4% loan due 15 days after he receives his refund.  Call me or e-mail if you have any questions."  <u>Id.</u>  He then states that "[b]oth notes are in Word so you can change them as you need to and use the note as a template if you need to create additional notes - or just call me and I will."  <u>Id.</u>

On January 30, 2008, Dent sent an email to Jeff Townley in which Dent stated "[i]f I am to testify [at the February 8, 2008

_____

[6]   The record contains a copy of a note from King to 911 Management, for $2,500.  Exh. B to Sellers Affid. at pp. 129-31. The term of the note was "until such time as Ron King receives the expected tax refund for the tax year 2006."  <u>Id.</u>  The note, plus $100 interest was due and payable fifteen days from the date King received his expected tax refund.  <u>Id.</u>  After that, interest was to accrue at four-percent.  <u>Id.</u>  Handwritten notes at the bottom of the third page of the note state that $50 was paid on February 13, 2008, $2,500 was paid on May 7, 2008, and $78.81 was paid on July 15, 2008.  <u>Id.</u>  This is followed by a note which states:  "Paid in Full D. Dent."  <u>Id.</u>

hearing on 911 Management's motion for preliminary injunction in the instant case], we need to get all of our ducks in order. I have signed promissory notes for three loans but there are a number of others we need promissory notes for." Deft Exh. 56.

Dent does not identify the three loans for which he had promissory notes, but he does list several for which he needs promissory notes. Id. The formatting of the email makes it difficult to understand which member of the Weathers family obtained the monies from 911 Management. Id. at p. 3. There are four names: Kayla, Kathy, Bradley, and Katie. Id. There is also one entry which states "Financial Awareness (for Brian)." Id. There are a total of fourteen separate amounts indicated. Id.

Townley and Dent created promissory notes after the fact. The government argues that these transfers of money from 911 Management to members of the Weathers family are nothing more than gifts, evidencing that 911 Management's bank account is nothing more than a personal bank account for the Weathers family.

911 Management does not dispute that promissory notes were backdated. 911 Management argues, however, that this is standard practice for small businesses. 911 Management asserts that it considered the loans as assets, in accordance with generally accepted accounting principles, and were reported to the IRS as loans. In support, 911 Management cites to its 2006 and 2007 tax returns.

In "Statement 3" to 911 Management's 2006 partnership tax return, 911 Management lists $8,500 in loans. Deft Exh. 9 at p. 14. Although there is no further explanation of this sum in the record, I assume for the purposes of this motion, that this

32 - FINDINGS & RECOMMENDATION/ORDER

includes the $8,000 loan to Kathy Weathers purportedly made on October 12, 2006. I make this assumption because of the nine promissory notes in the record, only this one is from 2006. There is no explanation by 911 Management of the additional $500 in loans claimed in its 2006 tax return.

In "Statement 3" to 911 Management's 2007 partnership tax return, 911 Management lists $8,500 in loans at the beginning of the year, but $221,908 at the end of the year. Deft. Exh. 10 at p. 14. There is no explanation for how the $221,908 was calculated. This figure is significantly higher than the approximate $17,340 total of the eight notes in the record which were executed in 2007. Exh. B to Sellers Affid. at pp. 106-14, 117-30.

I agree with 911 Management that simply backdating a promissory note does not prove that a transfer of money was not a loan. However, the evidence here shows that in addition to the backdating, many of the notes are unsigned by the borrower, the majority have not been paid back, and all are to Weathers family members. Additionally, the amount of loans shown in 911 Management's tax returns bears no correlation to the nine promissory notes in the summary judgment record. And, the recordkeeping of any repayment is quite informal, consisting of some handwritten notes, some acknowledged to have been written by Dent. Moreover, many of the alleged repayments occurred after this lawsuit was filed. Finally, 911 Management submits no evidence in support of its assertion that creating promissory notes after the fact is a common small business practice.

            b.   Payments to, or on behalf of, the Weathers
    Defendant cites to several payments to or on behalf of the

33 - FINDINGS & RECOMMENDATION/ORDER

Weatherses, and inaccurate records surrounding those payments, as evidence that 911 Management is the nominee of the Weatherses. I address them in turn.

### i. Lease Payments for Oregon Hotels

Defendant notes that 911 Management deducts as its own expenses the payments 911 Management makes on the Oregon hotel leases, which, based on the underlying leases, the Weatherses are personally obligated to pay. Deft Exh. 14 (Dec. 29, 2006 check #5938 from 911 Management to Katchis, LLC, lessor of the Kent Hotel, for $4,700; Dec. 29, 2006 check #5939 from 911 Management to DZ Real Estate, LLC, lessor of the Joyce Hotel, for $6,473.53); Deft Exhs. 9 & 10 (2006 and 2007 tax returns for 911 Management showing deductions for rent); Exh. B to Seller's Affid. at p. 68 (account entries in "register report" for 911 Management's bank account, on December 29, 2006, for check #5938 to Katchis, LLC for the Kent Hotel lease payment for $4,700, and for check #5939 to DZ Real Estate for the Joyce Hotel lease payment for $4,498.66[7]).

Defendant's point here is that by paying the personal obligations of the Weatherses, 911 Management ceases to be a separate entity, and by deducting the expense on its tax returns, 911 Management inappropriately treats a payment owed by the Weatherses as its own business expense, further blurring the line between 911 Management and the Weatherses.

911 Management argues that "[a]ll of the license fees paid [by 911 Management] to the Weathers, or directly to property owners on

---

[7]    There appears to be a discrepancy between the amount reflected in the actual check and the account entry for check.

[the Weatherses'] behalf" are tax deductible because "[t]hese are license fees Plaintiff pays in order to be permitted to enter the properties and operate them for its own account." Pltf Reply Mem. at pp. 19, 20.

As noted above, the License Agreements expressly state that they do not transfer rights and ownership in the underlying hotel leases, and are not to be considered an assignment of the lease. Deft Exhs. 12, 13. They also provide, however, that 911 Management is to make any disbursements required in the leases. Id. And, the License Agreements recite that since January 1, 2006, 911 Management had managed and operated the hotels, including payment of all expenses. Id. Thus, while the License Agreements appear to have made no transfer of the Weatherses' legal obligations under the leases to pay the rent on the hotels, they also indicate that 911 Management assumed the responsibility of making the rent payment on behalf of the Weatherses. The fact that 911 Management made the rent payments on the Weatherses' behalf is not inconsistent with the License Agreements.

911 Management's characterization of the rent payments as license fees is, however, inconsistent with, and unsupported by, the record. The record establishes that the license fee paid by 911 Management for its right to operate and manage the Oregon hotels, and to obtain the revenue therefrom, is three-percent of the hotels' gross revenue, and notably, is to be used for Kathy Weathers's living expenses.

In his deposition, Dent testified that under the hotel License Agreements, Tom Weathers's family receives three-percent of the gross revenue from the Joyce and Kent Hotels and that Tom Weathers

35 - FINDINGS & RECOMMENDATION/ORDER

1  and Dent had an agreement that Tom Weathers's family would receive
2  that money by 911 Management paying the living expenses of Kathy
3  Weathers.   Deft Exh. 11 (Dent Depo.) at pp. 86-87.   The agreement
4  included payments for Kathy Weathers's housing, auto expenses, auto
5  and health insurance, and phone.   Id. at pp. 87, 90.   According to
6  Dent, 911 Management usually writes a check directly to the third
7  party, with the exception of the phone expense which Kathy Weathers
8  paid herself, but was then reimbursed by 911 Management.   Id. at p.
9  88.

10      Additionally, since, as discussed above, there is no evidence
11 in the record to show the gross proceeds of the Oregon hotels in
12 2006 and 2007, and thus, no way to calculate three-percent of those
13 proceeds, the Court cannot evaluate whether the rent payments to
14 the hotels, plus the living expenses for Kathy Weathers, equal the
15 three-percent to be paid to the Weatherses under the hotel License
16 Agreements.   911 Management's assertion here that the rent payments
17 are part of that license fee does not make it so.

18      911 Management's argument that the $10,000 per month rent
19 payments it makes on behalf of the Weatherses for the Oregon
20 hotels, is part of the three-percent license fee it owes the
21 Weatherses under the License Agreements, finds no support in the
22 record.   Its characterization of these rent payments as a license
23 fee is thus undermined.   911 Management has described its license
24 fee payments as payments of Kathy Weathers's living expenses.   The
25 rent payments for the hotels are in no way "living expenses of
26 Kathy Weathers."   Furthermore, while the entity operating the
27 hotels may or may not be able to properly deduct the rent payments
28 as some type of ordinary business expense, 911 Management fails to

36 - FINDINGS & RECOMMENDATION/ORDER

1    show that it properly accounted for the lease payments as license
2    fees and thus, its deductions of these payments on its income tax
3    returns because they were license fees, is questionable.

ii.   The Three-Percent License Fee

5        Defendant asserts, and 911 Management does not deny, that 911
6    Management also deducts as its own expenses, the payments it makes
7    for Kathy Weathers's housing and for her car repairs.  Deft Exh. 16
8    (June 1, 2006 check #5394 from 911 Management to "P.V.L, LLC" in
9    Vancouver, Washington for "Weathers 4809 NE 109th St.," for
10   $1,800); Deft Exh. 17 (August 7, 2006 check #5572 from 911
11   Management to Chrysler Financial, for $704.72); Exh. B to Sellers
12   Affid. at p. 48 (account entry showing check #5394 as payment to
13   "P.V.L., LLC" for "Rent/4809 NE..." with "Weathers 48..." noted in
14   the "memo" column, not noted as a member distribution or as three-
15   percent license fee); Id. at p. 54 (account entry showing check
16   #5572 as payment of "Auto:Loan/KA," not as a member distribution or
17   payment of the three-percent license fee).

18       911 Management states that payments to partners in capacities
19   other than partners, such as a licensor under a license agreement,
20   are property accounted for as transactions with "one who is not a
21   partner" under Internal Revenue Code § 707(a)(1).  911 Management
22   contends that it properly records on its books all of these
23   payments and consistently reports them to the IRS.

24       911 Management's summary judgment record on this issue is
25   incomplete.  While the Internal Revenue Code may allow 911
26   Management to consider the three-percent license fee it owes to Tom
27   and Kathy Weathers by 911 Management under the License Agreements
28   to be recorded as a transaction under section 707(a)(1) and

37 - FINDINGS & RECOMMENDATION/ORDER

deductible as an ordinary business expense (an issue I do not decide in this case), the bank account records (as summarized by example above) do not denote the payments as such, calling into question the accuracy and truthfulness of such records. Additionally, while 911 Management's 2006 tax return shows a deduction for taxes and licenses in the amount of $162,222, and the 2007 tax return shows a deduction for taxes and licenses in the amount of $125,202, 911 Management makes no attempt in this case to explain to the Court what portion of those deductions was for "licenses" as opposed to taxes, or to show that the deduction for licenses, whatever it was, was the total of the payments made for Kathy Weathers's living expenses, the only payment of the three-percent fee made by 911 Management according to Dent.

Furthermore, while 911 Management records funds it pays on behalf of the Weatherses in its books, Dent calculates the three-percent figure only once annually, when he files the tax returns. Deft Exh. 11 (Dent Depo.) at pp. 88-90.  He automatically pays Kathy Weathers's living expenses, with no regard to whether the payments are above or below the three-percent figure. Dent assumes the amounts average out over a period of years.  Id.  In 2006, however, Dent thought that 911 Management paid Kathy Weathers more than the three-percent fee, but he never made an attempt to have her repay it.  Id.

iii.  Charitable Contributions

911 Management made several payments to Crossroads Community Church in 2006 and 2007.  For example, on January 13, 2006, 911 Management issued a check to Crossroads Community Church for $2,200.  Deft Exh. 52 (Jan. 13, 2006 check #5001).  The memo

section of the check references "Tom & Kathy Weathers." Id.  At

the top of the check, there is a separate reference to "Account:

TOM & KATHY WEATHERS." Id.[8]  911 Management's 2006 and 2007 tax

returns show that 911 Management claimed deductions for charitable

contributions in each of those years.  Deft Exhs. 9, 10, at p. 3,

line 13a, and p. 14 (showing a $66,800 deduction in 2006, and an

$82,300 deduction in 2007).

Defendant argues that 911 Management's payment of a charitable

contribution on behalf of Kathy Weathers should be treated as a

distribution to Kathy Weathers and not as a contribution made by

911 Management itself, and not as a deduction on 911 Management's

income tax return.  911 Management argues that partnership

charitable contributions are properly deducted at the partnership

level, then apportioned among the partners according to their

interests, and passed through to the partners in the Schedules K-1.

911 Management argues that charitable contributions are not treated

as direct distributions to any partner because no distribution to

a member is made.

Defendant's argument is not addressed to charitable

contributions that 911 Management itself actually made on 911

Management's behalf.  Rather, defendant argues that the check

---

[8]  While the record contains only one copy of an actual
check, 911 Management's account records indicate that a similar
check was issued regularly.  E.g., Exh. B to Sellers Affid. at p.
39 (Mar. 10, 2006 check to "Crossroads" for $2,000 with the Memo
noted as "Tom & Kathy" and the Category noted as "Contribution");
p. 42 (same, but dated April 12, 2006), at p. 46 (same, but dated
May 11, 2006), at p. 64 (same, but dated Nov. 10, 2006), at p. 83
(same, but dated May 10, 2007), at p. 93 (same, but dated Sept.
10, 2007), at p. 103 (same, but dated Dec. 10, 2007).

39 - FINDINGS & RECOMMENDATION/ORDER

issued to Crossroads Community Church in January 2006 with its multiple references to Tom and Kathy Weathers, including one which actually refers to Tom and Kathy Weatherses' account, is a personal contribution of the Weatherses that was made by 911 Management and inappropriately documented as having been 911 Management's contribution.

It is undisputed that there are multiple references to Tom and Kathy Weathers in connection with this contribution, including a reference to their account.  911 Management submits no evidence, other than the fact that the check was drawn on 911 Management's bank account, showing that this contribution was on behalf of 911 Management as opposed to Tom and Kathy Weathers.

iv.  Member Distributions

911 Management makes member distributions under Section IX of 911 Management's Operating Agreement.  Deft Exh. 8 at pp. 8-9. Dent testified at the preliminary injunction hearing that at the beginning of 911 Management's formation, he was confused about how to distribute money as member distributions to member Kathy Weathers. Exh. A to Sellers Affid (Dent Pre. Inj. Test.) at p. 12. He spoke to Jeff Townley who told him that 911 Management could write checks for medical bills and other bills and list those as member distributions to Kathy Weathers.  Id. at pp. 12-13.  He further described that "we kind of streamlined the process and turned her distribution into a once-a-month check" which was initially $5,000 per month, but then changed to $5,700 per month.

Id. at p. 13.[9]

In his deposition, Dent testified that he arrived at the $5,700 per month figure after he told Jeff Townley the approximate amount of income that 911 Management earned each month. Deft Exh. 62 (Dent Depo.) at pp. 59-60. Dent admitted that 911 Management's income varied every month, but he nonetheless paid Kathy Weathers the same $5,700 payment each month. Id. He thinks he did calculations to show that the $5,700 figure was an average, but he did not save his work. Id.

In support of its summary judgment motion, 911 Management asserts that recently, "the monthly member distributions have been $5,700, which has been paid through direct disbursements to Kathy Weathers, and also through payments of living expenses on her behalf." Pltf CSF at ¶ 43. I note some inconsistency in this assertion. 911 Management has previously asserted, as noted above, that it pays Kathy Weathers's living expenses as part of the three-percent license fee under the Joyce and Kent hotel License Agreements. But here, 911 Management also asserts that some living expenses are paid as part of 911 Management's member distributions.

911 Management then asserts that "[i]n all cases, Dan Dent

[9]   Dent's testimony at the preliminary injunction hearing in February 2008, and at his deposition in October 2008, was that the "streamlined" monthly membership distribution to Kathy Weathers was $5,700. See Exh. A to Sellers Affid. (Dent. Pre. Ing. Test.) at p. 12; Deft Exh 62 (Dent Depo.) at p. 59 (noting that after a few months of payment certain expenses, 911 Management arrived at a "set amount, just the 5,700 a month"). 911 Management's bank account records, as detailed more fully below, show, however, that the "set amount," streamlined monthly payments to Kathy Weathers were initially $5,000 per month, changing to $5,700 per month in March 2007. Exh. B to Sellers Affid.

41 - FINDINGS & RECOMMENDATION/ORDER

1  recorded the payments to Kathy Weathers in Plaintiff's books and

2  records as member distributions to or for the benefit of Kathy

3  Weathers, in conformity with IRC §§ 704 and 731."  Pltf CSF at ¶

4  44.  In support of this, 911 Management cites to seventy-two pages

5  of its bank account records for all of 2006 and 2007, with no

6  discussion or reference to a particular page or particular entry.

7  Failure to cite to a particular page within an exhibit is an

8  unnecessary burden on the Court.

9       While the Court owes no duty to a party to comb through pages

10 of material to find the supporting information, my review of 911

11 Management's account records shows the following items recorded as

12 "member distributions" in 2006 and 2007:

13      January 18, 2006:    $41.02 to "Waste Conne..."
        January 19, 2006:    $230 to "Southwest Wa..." for Tom
14                           Weathers
        January 20, 2006:    $196 to "Northwest Acu..." for Kathy
15                           Weathers
        January 20, 2006:    $195 to "Vancouver Ra..." for Kathy
16                           Weathers
        January 20, 2006:    $125.75 to Verizon Wireless for Kathy
17                           Weathers
        January 23, 2006:    $200 to "Cascade Hear..."
18      January 24, 2006:    $80 to "Parking Services"
        January 25, 2006:    $107.66 to Comcast Cable for Kathy
19                           Weathers
        January 26, 2006:    $1,161.91 to American Express
20      January 25, 2006:    $92.81 to Clark Public Utilities
        January 26, 2006:    $155 to "Firstmed East ..."
21      January 27, 2006:    $229.40 to "Legacy Salmo..."
        January 30, 2006:    $323.73 to "Hudson Bay M..."
22      January 31, 2006:    $41.02 to "Waste Conne"
        February 1, 2006:    $2,500 to Kathy Weathers
23      February 8, 2006:    $2,500 to Kathy Weathers
        February 15, 2006:   $287.77 to "Northwes..."
24      February 16, 2006:   $87.74 to Verizon Wireless
        February 21, 2006:   $230 to "Southwest Was..." for Tom
25                           Weathers
        March 1, 2006:       $2,500 to Kathy Weathers
26      March 15, 2006:      $2,500 to Kathy Weathers
        March 20, 2006:      $230 to "Southwest Was..." for Tom
27                           Weathers
        March 30, 2006:      $50.70 to "Vancouver Ra..."
28      April 3, 2006:       $5,000 to Kathy Weathers

42 - FINDINGS & RECOMMENDATION/ORDER

| | |
|---|---|
| April 19, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| May 1, 2006: | $5,000 to Kathy Weathers |
| May 19, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| June 1, 2006: | $5,000 to Kathy Weathers |
| June 19, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| June 23, 2006: | $3,606.58 to "Pro-tech" |
| June 27, 2006: | $5,000 to Kathy Weathers |
| July 21, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| Aug. 1, 2006: | $5,000 to Kathy Weathers |
| Aug. 18, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| Sept. 1, 2006: | $5,000 to Kathy Weathers |
| Sept. 19, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| Sept. 29, 2006: | $5,000 to Kathy Weathers |
| Oct. 19, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| Nov. 1, 2006: | $5,000 to Kathy Weathers |
| Nov. 20, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| Nov. 30, 2006: | $5,000 to Kathy Weathers |
| Dec. 19, 2006: | $230 to "Southwest Was..." for Tom Weathers |
| Dec. 29, 2006: | $5,000 to Kathy Weathers |
| Jan. 19, 2007: | $230 to "Southwest Was..." for Tom Weathers |
| Jan. 31, 2007: | $5,000 to Kathy Weathers |
| Feb. 16, 2007: | $230 to "Southwest Was..." for Tom Weathers |
| March 1, 2007: | $5,000 to Kathy Weathers |
| March 8, 2007: | $700 to Kathy Weathers |
| March 19, 2007: | $230 to "Southwest Was..." for Tom Weathers |
| March 28, 2007: | $209.41 to "Southwest Was..." for Tom Weathers |
| March 30, 2007: | $5,700 to Kathy Weathers |
| June 25, 2007: | $5,700 to Kathy Weathers |
| July 31, 2007: | $5,700 to Kathy Weathers |
| Aug. 31, 2007: | $5,700 to Kathy Weathers |
| Sept. 28, 2007: | $5,700 to Kathy Weathers |
| Nov. 1, 2007: | $5,700 to Kathy Weathers |
| Nov. 15, 2007: | $5,700 to Kathy Weathers |
| Dec. 1, 2007: | $5,700 to Kathy Weathers |

Exh. B to Sellers Affid. at pp. 33-38, 40-43, 45-46, 48-50, 52-53, 55, 57-59, 61, 63, 65-66, 67-68, 72-73, 75-79,86, 89, 92, 95, 99, 101-02.

43 - FINDINGS & RECOMMENDATION/ORDER

1      The records show, beginning in February 2006, monthly
2    distributions of $5,000 to Kathy Weathers, changing to $5,700 in
3    March 2007, with the exception of payments in approximately April
4    and May 2007.   The records show a regular payment of $230 to
5    "Southwest Was..." on behalf of Tom Weathers, an expense not
6    fitting 911 Management's characterization of the member
7    distributions being made to Kathy Weathers directly or for living
8    expenses paid by 911 Management for Kathy Weathers's benefit.  That
9    expense is also not characterized as a payment to either of the
10   other two of 911 Management's members (T&K Weathers, LLP or Club
11   Ed).   The records also show a variety of payments to other
12   entities, the purpose of which, and for the benefit of which
13   member, is unclear.   Finally, and importantly, while the records
14   support 911 Management's assertion that 911 Management recorded
15   these entries as "member distributions," these account logs do not
16   show, without more, that 911 Management acted "in conformity with
17   IRC §§ 704 and 731."

18     Kathy Weathers admitted during her deposition that she
19   receives the $5,700 monthly distribution from 911 Management in
20   cash because she does not use a bank account as a result of the IRS
21   taking money from one if she used one.  Deft Exh. 5 (Kathy Weathers
22   Depo.) at pp. 40-41.

23     Defendant argues, essentially, that the fact that Dent makes
24   the distributions based on a one-time educated guess using average
25   income instead of basing the distribution on 911 Management's
26   actual income, shows that 911 Management's income is tantamount to
27   personal income for the Weatherses because Kathy Weathers receives
28   the same distribution regardless of how the business is doing, and

44 - FINDINGS & RECOMMENDATION/ORDER

with no ongoing assessment by the manager of whether the distribution is consistent with Kathy Weathers's thirty-five percent interest in 911 Management.    Additionally, as defendant notes, Kathy Weathers admits taking the distributions in cash, to avoid reporting the income to the IRS.

911 Management argues that the positive balance in the capital accounts shows that the $5,700 month 911 Management pays to Kathy Weathers, is less than what she is owed as member distributions. The first problem with this argument is that 911 Management's tax returns show nothing more than what 911 Management reported to the IRS and nothing more than a snapshot of the capital account as of a particular day.    Thus, while there may be a positive balance in the capital account, without more in-depth accounting records demonstrating the basis for all the figures in the tax returns, the tax returns themselves show very little.

The second problem is that the information that is contained in the record raises more questions than it answers.    911 Management's 2006 income tax return shows Kathy Weathers had a beginning capital account of $0. Deft's Exh. 9 at p. 5 (Sch. K-1).[10]    The tax return then shows that 911 Management made $65,272 in distributions to Kathy Weathers in 2006.    Id.    It also shows that 911 Management made $21,348 in distributions to Club Ed, and $53,764 in distributions to T&K Weathers, LLP.    Id. at pp. 8, 11. However, the bank account records show a total of $69,982.09 in member distributions for 2006, excluding those made for Tom

---

[10]    The record contains no evidence that any of 911 Management's members made an initial capital contribution to the partnership.

45 - FINDINGS & RECOMMENDATION/ORDER

Weathers, who is not a member of 911 Management.  Additionally, the bank account records show no distributions to T&K Weathers, LLP, or to Club Ed, yet the K-1s reflect distributions made to those members.   The K-1s filed with plaintiff's 2006 tax return are inconsistent with the bank account records.

The same is true for 2007.  911 Management's 2007 tax return shows $56,084 in member distributions to T&K Weathers, LLP in 2007, but the bank account records reveal no distributions to that member.  Deft Exh. 10 at p. 5.  The 2007 tax return shows $62,899 in member distributions to Kathy Weathers in 2007.  Id. at p. 8. The bank account records show $56,300 in member distributions directly to Kathy Weathers in 2007, and $57,199 if member distributions on behalf of Tom Weathers, a non-member, are included.  And, while the bank account records show no member distributions to Club Ed, the tax return shows $24,508 in distributions to Club Ed in 2007.  Id. at p. 11.

As noted here, no entry in 911 Management's account records shows that 911 Management made a payment recorded as a "member distribution" to Club Ed in 2006 or 2007.  Rather, payments for school-related expenses or books are most often made directly to a third-party with an entry in the "memo" or "category" column referencing "Club Ed."  E.g., Exh. B to Sellers Affid. at p. 33 (Jan. 15, 2006 payment of $404.13 to "Vancouver Sc...," with "Katie Weathers" noted in the memo section and "Club Ed/KATI..." noted in the category section), p. 37 (same, except date is Feb. 15, 2006), p. 46 (same, except date is May 17, 2006), p. 55 (same, except date is Aug. 15, 2006).

Some entries show that payment was made directly to a member

46 - FINDINGS & RECOMMENDATION/ORDER

of the Weathers family. E.g., id. at p. 57 (Sept. 5, 2006 payment to Kayla Weathers for $2,746.25, with "Club Ed" noted in the memo section and "Club Ed/KAYL..." noted in the category section), p. 58 (Sept. 15, 2006 payment to Katie Weathers for $251.77, with "reimbursement" noted in the memo section and "Club Ed/KATI..." noted in the category section), p. 62 (same, except date is Oct. 19, 2006, and amount is $517.59), p. 73 (Jan. 31, 2007 payment to Kayla Weathers for $2,862.50, with "Club Ed" noted in the memo section and "Club Ed/KAYL..." noted in the category section), p. 83 (May 15, 2007 payment to Katie Weathers for $700 with "Club Ed" noted in the memo section and "Club Ed/KATI..." noted in the category section).

Other entries show a payment to a credit card with a reference to Club Ed. E.g., id. at p. 58 (Sept. 14, 2006 payment of $819.88 to "S Chase Card S..." with no note in the memo section but "Club Ed/KATI..." noted in the category section), p. 71 (Jan. 16, 2007 payment to "S. Chase," which included $83.51 which is noted in the category section to be "Books/Club Ed"), p. 75 (Feb. 16, 2007 payment of $315.93 to "S Chase Cardm..." with "textbooks" indicated in the memo section and "Club Ed/KAYL..." noted in the category section).

Defendant contends that these payments cannot be viewed as member distributions by 911 Management to Club Ed because no money ever goes to Club Ed, which, as defendant notes, does not have a bank account and does not file a federal tax return. Defendant argues that because the payments go primarily to the Weatherses, or are made to third parties on their behalf, the money is not a member distribution to Club Ed, but is income to Kathy Weathers

47 - FINDINGS & RECOMMENDATION/ORDER

1  which is then used to pay personal family expenses such as tuition
2  and books for her children.

3       911 Management argues that the money is paid to a
4  "beneficiary," meaning a student, and is credited on 911
5  Management's books as a member distribution for Club Ed's account
6  pursuant to the tax code.   911 Management argues that the
7  distributions made at Club Ed's behest are accounted for in Club
8  Ed's capital account.   But, as demonstrated below, the figures
9  shown in the tax return establish nothing more than their presence
10 on tax forms without adequate back-up documentation, which is not
11 in the record.   The records are poorly maintained and the amounts
12 in the bank accounts do not equal the member distributions shown in
13 the K-1s.

14             c.  Accounts in Tom Weathers's Name

15      Some of the bills for the operational expenses of the Oregon
16 and Washington properties are in accounts held in Tom Weathers's
17 name.  Deft Exh. 63 (Dent Depo.) at p.. 14, 15, 18.  A phone bill
18 from Qwest for the Hudson Hotel in Longview is in the name of
19 "Thomas D. Weathers, Hudson Hotel." Id.; Deft Exh. 64.  The water
20 bill for the Kent Hotel is also in the name of Tom Weathers, but is
21 paid by 911 Management.  Id.

22             d.  Summary of Recordkeeping Issues

23      As suggested at the beginning of the discussion of this
24 factor, the question of whether the parties recorded a conveyance
25 is inapplicable here because there is no "conveyance" of real
26 property.  Rather, the relevant question is whether the parties
27 adhered to the formalities one would expect them to adhere to in
28 forming 911 Management, in managing the income-producing

48 - FINDINGS & RECOMMENDATION/ORDER

1  properties, in distributing income, and in paying expenses. That
2  is, did the Weatherses observe the appropriate formalities
3  indicating that they and 911 Management are separate entities?

4      The record shows that there inaccuracies or inconsistencies in
5  several recordkeeping areas: (1) promissory notes; (2)
6  characterizing the lease payments to the Oregon hotels as license
7  fees; (3) the three-percent license fee; (4) charitable
8  contributions; (5) member distributions; and (6) distributions to
9  Club Ed.

10     Overall, as revealed by the discussion of this factor, 911
11  Management's recordkeeping raises serious questions about the lack
12  of separation between 911 Management and the Weatherses. As to the
13  promissory notes, there is an overwhelming amount of evidence to
14  suggest that these were not loans:  the promissory notes were
15  backdated, and most of them not formalized until after initiation
16  of this litigation; they were typically not signed; the majority
17  were not paid back, and payments made toward an outstanding balance
18  typically occurred after initiation of this litigation; the
19  transfers of money from 911 Management were to Weathers family
20  members; and only informal handwritten notes were kept of any
21  payments made by the recipient family members. Additionally, the
22  amount of loans documented by the promissory notes is inconsistent
23  with 911 Management's tax returns.

24     As to the lease payments on the Oregon hotels, the failure of
25  proof as to the amount of income generated by the hotels means the
26  Court cannot calculate the three-percent license fee owed to the
27  Weatherses under the License Agreements, which in turn undermines
28  911 Management's characterization of the lease payments, which

49 - FINDINGS & RECOMMENDATION/ORDER

remain personal obligations of the Weatherses, as part of that license fee and as a legitimate, tax-deductible ordinary business expense for 911 Management as a license fee.

Additionally, Dent's assessment of living expense payments on behalf of Kathy Weathers as equal to the three-percent fee owed to the Weatherses, is informal with no regular reassessment of whether he is over- or underpaying the amount owed.  The bank account records do not denote any of these expenses as a license fee and there is no explanation of how the living expenses allegedly paid as the license fee correlate to the amounts claimed as license fees in the tax returns.

The facts surrounding the charitable contributions indicate that these were personal contributions by Kathy and Tom Weathers which 911 Management should have recorded as a member distribution to Kathy Weathers, or to T&K Weathers, LLP (but in no event directly to Tom Weathers, as he is not a member of 911 Management), and thus income, to the Weatherses.  By claiming it as one made by 911 Management, 911 Management obfuscated income received by Kathy and Tom Weathers and inappropriately took a deduction for it on its own tax return.

The facts surrounding the membership distributions are also problematic for 911 Management.  Again, Dent's assessment of how much Kathy Weathers is owed as a member of 911 Management lacks any documentation.  The distributions are inconsistent with the tax returns, none are made directly to other members, and some are made on behalf of Tom Weathers, who is not a member of 911 Management.

Finally, the fact that some utility accounts remain in Tom Weathers's name can be viewed as an indication of the lack of

1   separation between 911 Management and Tom Weathers.

2       Overall, the summary judgment record as to 911 Management's
3   recordkeeping overwhelmingly suggests that 911 Management kept
4   sloppy records and now, in the face of a request to explain its
5   practices, it offers theories and explanations which make no sense.
6   For 911 Management to prevail on its summary judgment motion, the
7   deposition testimony, tax returns, bank account records, and other
8   exhibits such as the promissory notes, must show that plaintiff is
9   a separate limited liability company whose income is its own.  To
10  survive the government's summary judgment motion, 911 Management
11  must create an issue of fact in opposition to defendant's motion
12  dispelling the notion that money belonging to Tom and Kathy
13  Weathers passes through 911 Management back and forth to Tom and
14  Kathy Weathers.  The records here are insufficient for either
15  purpose.  They fail to reveal the full distribution of income and
16  they do not show the payment of the three-percent license fee.

17      Taken together, what the records show is an entity that (1)
18  receives income from assets which formerly produced income to Tom
19  and Kathy Weathers, either directly (the Oregon hotels) or to T&K
20  Weathers, LLP (the Washington properties), (2) pays the expenses
21  associated with those assets; and (3) pays money out to Kathy
22  Weathers, Tom Weathers, or for the benefit of Tom and Kathy
23  Weathers and members of their family, without any support for those
24  payments being made in amounts corresponding to the ownership
25  interest of Kathy Weathers or T&K Weathers, LLP.  911 Management
26  makes a half-hearted attempt to keep separate books and records to
27  show itself as a separate entity.  But, 911 Management's financial
28  conduct is so poorly executed, so inaccurate, and so poorly

1  documented, at least in this record, that it cannot be said the

2  money in this bank account belongs to 911 Management.  Here, 911

3  Management fails to make a showing sufficient to establish that it

4  acts via its accounting practices, recordkeeping, and distribution

5  of monies to its members or to its lessors or owners of the

6  properties it manages, as a separate entity.

7         5.  Whether the Transferor Retained Possession

8         The question to ask in this case is whether the Weatherses,

9  who transferred the right to operate the Oregon and Washington

10 properties and receive the revenue therefrom, retained control over

11 the operation of the properties, or over 911 Management, to a

12 degree that is inconsistent with their purported transfer and

13 License Agreements.

14        Three facts are relevant here.  First, the Weatherses retain

15 control over the income-producing real property by virtue of being

16 the lessees of the Oregon hotels and the owners of the Washington

17 properties (via T&K Weathers, LLP, for which Tom Weathers makes all

18 decisions).

19        Second, as to the day-to-day management of the properties, and

20 thus the income produced by the properties, Tom and Kathy Weathers

21 have, as previously explained, a significant interest in 911

22 Management, even without regard to Club Ed.  Tom Weathers hired

23 Dent, a longtime friend and godfather to his children, to run 911

24 Management.  911 Management's Operating Agreement requires that the

25 hiring of 911 Management's manager be by unanimous consent of the

26 members of 911 Management.  Deft Exh. 8 at p. 4.  Tom Weathers's

27 single-handed hiring of Dent as manager violates the Operating

28 Agreement, suggesting that the unanimous consent provision is

52 - FINDINGS & RECOMMENDATION/ORDER

illusory and further suggesting Tom Weathers's inclination to disregard the separate entity created by the Operating Agreement. Dent meets with Tom Weathers about once each month. Additionally, the Operating Agreement allows Dent to be fired without unanimous consent[11], and thus, by Tom and Kathy Weathers, without cause. Accordingly, while the Operating Agreement provides that 911 Management's manager (Dent) has control of 911 Management's affairs and control of 911 Management's bank account, the evidence demonstrates that the Weatherses have control and power over Dent.

Third, the written License Agreements give Tom and Kathy Weathers the unilateral right to terminate the agreements under which 911 Management obtains the revenue to the hotels. No reciprocal termination provision is given to 911 Management. There is no evidence regarding termination of the oral agreements pertaining to the Washington properties.

The evidence demonstrates that the Weatherses, as transferors of the right to operate the Oregon hotels and Washington

_____

[11] Contrary to 911 Management's argument, firing the manager is not one of the actions listed in the Operating Agreement as requiring unanimous consent of the members. Deft Exh. 8. The term of office of the manager states that the manager shall serve until the earliest of a breach of duty as specified, or until removal of such manager. Id. There is no further mention in the Operating Agreement about removal of a manager or a breach of duty. Without anything more specific in the Operating Agreement, the manager may be removed by a vote of members with a majority interest in 911 Management. Wash. Rev. Code § 25.15.150(2). Through T&K Weathers, LLP, and Kathy Weathers, Tom and Kathy Weathers have a sixty-percent interest in 911 Management, and thus, Dent is subject to their control and they may remove him from this position. Moreover, as expressed above, Jeff Townley appears to simply follow Dent's recommendations in terms of Club Ed's expenditures and it is doubtful that Club Ed is truly a separate entity.

properties, and thus to receive the revenue therefrom, retained the right to control the properties and 911 Management.  This factor weighs in favor of the government.

6.    <u>Whether the Transferor Continues to Enjoy the Benefit of the Transferred Property</u>

For this factor, the appropriate question is whether the Weatherses continue to receive, in some manner, the revenue generated by the properties even after they transferred away the right to that revenue.  Many of the facts previously discussed are relevant here.  The written License Agreements provide Tom and Kathy Weathers with three-percent of the gross revenue of the Oregon hotels.  And, because Dent pays all of Kathy Weathers's living expenses directly without keeping track of how such sums relate to the three-percent fee owed to the Weatherses, it is possible that the Weatherses enjoy the benefit of more than the three-percent they are entitled to under the License Agreements. Tom and Kathy Weathers also receive a benefit each time 911 Management makes a mortgage payment on the Washington properties on behalf of T&K Weathers, LLP.

Next, Kathy Weathers receives $5,000 to $5,700 per month, in cash, from 911 Management as a "member distribution."  The majority of the payments made on behalf of Club Ed have gone directly to pay tuition and school expenses for Katie and Kayla Weathers.  Thus, under the License Agreements for the Oregon properties, the oral agreements for the Washington properties, and the "member distributions" by 911 Management, the Weatherses receive substantial income generated by the properties.

There are also payments made by 911 Management on Tom

54 - FINDINGS & RECOMMENDATION/ORDER

Weathers's behalf that do not appear to be either the three-percent license fee, a member distribution, or a payment of a mortgage for the Washington property.  E.g., Exh. B to Sellers Affid. at p. 34 ($27.78 payment on Jan. 20, 2006 for "PHONE/TKW"), p. 44 ($1,000 payment on April 25, 2006, for arbitration award); Deft Exh. 22 (copy of check for arbitration award which references "Tom Weathers," "Kent Hotel Arbitration" in memo section).  Tom Weathers "enjoys the benefit" of the income produced by the properties every time 911 Management pays an obligation he owes.

911 Management admits that its sole source of income is derived from the rental of the Oregon and Washington properties. But for the creation of 911 Management by the Weatherses, and the agreements between the Weatherses and 911 Management regarding the operation of these properties, the income produced by the properties would be going directly to the Weatherses (for the Oregon hotels), or directly to T&K Weathers, LLP (with Tom and Kathy Weathers as general partners).  The income generated by the properties is initially paid to 911 Management, but it still ends up in the hands of the Weathers family either via the License Agreements, the cash membership distributions paid to Kathy Weathers, or the payments made on the Weatherses' behalf for a host of obligations they carry.  Some of the income goes to their children.  The Weatherses still enjoy the benefits of the "transferred property," meaning the income generated by the properties they lease or own.

### 7.  The Source of the Funds Used to Purchase the Property

This factor is not relevant to the facts presented here.

55 - FINDINGS & RECOMMENDATION/ORDER

       8.    <u>The Taxpayer's Continued Use of the Property</u>
               <u>Without Payment of Fair Rental Value</u>

This factor is not relevant to the facts presented here.

       9.    <u>The Taxpayer's (Tom and Kathy Weatherses')</u>
               <u>Continued Payment of Maintenance Charges and</u>
               <u>Real Estate Taxes</u>

911 Management appears to pay all of the operational expenses of the properties, including the rent owed by Kathy and Tom Weathers as the lessees of the Oregon hotels, and the mortgage payments owed by T&K Weathers, LLP, on the Washington properties. Because 911 Management, and not taxpayers Tom and Kathy Weathers, make these payments, this factor favors 911 Management.

       10.   <u>The Taxpayer's Acts of Holding Himself Out as</u>
              <u>the Owner of the Property</u>

In March 2008, Tom Weathers wrote a letter to the lawyer for D.Z. Real Estate regarding to the lease re-negotiations for the Joyce Hotel. Deft Exh. 32. In the letter, Tom Weathers states that DZ Real Estate had threatened to lock "us" out, and had threatened to "prevent us from operating our company at the property located at 322 SW 11th Ave." <u>Id.</u> He further states that "[y]ou are aware that we have operated as a holdover . . . ." <u>Id.</u> Tom Weathers refers to the "name, equipment, phones, phone numbers, [and] operating contracts" as "my property." <u>Id.</u> He again refers to the business as "our" operation. <u>Id.</u>

Even though Tom & Kathy Weathers are the lessees of the Joyce Hotel, and thus, Tom Weathers's direct involvement in the re-negotiation of a lease does not raise suspicion, his repeated inclusion of himself as part of the business that operates the Joyce Hotel shows that he considers himself to be 911 Management, or an instrumental part of 911 Management. This factor may

56 - FINDINGS & RECOMMENDATION/ORDER

1   slightly weigh in favor of the government, but overall, it is of
2   little importance given that Tom Weathers remains a lessee in
3   regard to the property.

4       B. Nominee Analysis

5       In the nominee analysis, the issue is whether the alleged
6   nominee holds an asset for the taxpayer while the taxpayer actually
7   exerts control over the asset.  The factors articulated in Towe and
8   Colby B. are tools used to determine the amount of control the
9   delinquent taxpayer has over an asset.

10      With the exception of whether Dent or Jeff Townley is the
11  final decisionmaker for Club Ed distributions, and thus, Club Ed
12  membership, the facts in this case are undisputed.  The parties
13  agree that the issues are capable of resolution on summary
14  judgment.

15      As discussed above, even construing the facts in 911
16  Management's favor, the evidence shows that (1) 911 Management was
17  created in anticipation of liabilities, (2) the Weatherses and 911
18  Management have a close relationship, (3) 911 Management maintains
19  questionable account records and engages in questionable conduct in
20  handling different categories of payments, suggesting that the
21  Weatherses do not treat 911 Management as a distinct entity, (4)
22  the Weatherses retained significant control over 911 Management,
23  (5) the Weatherses continued to enjoy the benefit of the income
24  produced by the properties, and (6) Tom Weathers has held himself
25  out as being part of 911 Management.

26      911 Management cannot prevail on its motion for summary
27  judgment given the complete failure of evidence demonstrating that
28  it is a separate entity.  Based on the entire preceding discussion

57 - FINDINGS & RECOMMENDATION/ORDER

1  of the ten factors, the evidence in the record is such that, even
2  construing the evidence and the inferences therefrom in a light
3  most favorable to 911 Management, all reasonable jurors would
4  conclude that 911 Management is not an entity separate from the
5  Weatherses and thus, that 911 Management is the nominee of Tom and
6  Kathy Weathers.

7      I recommend that defendant's motion be granted on the issue of
8  whether 911 Management is the nominee of the Weatherses, and that
9  911 Management's motion be denied.

10     C.  Alter Ego

11     The factors used to determine if an entity is the alter ego of
12 the delinquent taxpayer are set out above.  Generally, the issue in
13 the alter ego analysis is whether the domination or control by the
14 taxpayer is so extensive that it negates any separate entity
15 distinction.  The control must be active and substantial.

16     Neither party adds significant, separate discussion regarding
17 the alter ego issue.  Many of the factors overlap with the nominee
18 analysis and the parties primarily rely on their nominee-related
19 arguments.

20     As noted above, the Weatherses maintain significant control
21 over 911 Management.  They use 911 Management to shield themselves
22 from liability for payment of their income taxes.  As a result,
23 they use 911 Management for their own financial benefit.  As for
24 mingling affairs, there is substantial evidence showing that the
25 Weatherses ignore 911 Management's status as a separate entity.
26 Finally, although the Weatherses rely on Dent to actually operate
27 911 Management, they retain the ability to fire him.  While Dent's
28 managerial role somewhat mutes the Weatherses' control over day to

58 - FINDINGS & RECOMMENDATION/ORDER

1   day management of 911 Management, the fact that they, as majority
2   members of 911 Management, can terminate Dent without cause,
3   indicates that they retain control over his decisionmaking.
4   Further, Dent pays whatever the Weatherses tell him to pay without
5   regard to whether the payments exceed what the Weatherses are
6   entitled to receive.  Indeed, it is difficult to see Tom Weathers's
7   entitlement to any payments on his behalf, yet he has received
8   some.

9        On balance, the evidence, construed in the light most
10  favorable to 911 Management, shows that 911 Management is the alter
11  ego of the Weatherses.  I recommend that defendant's motion be
12  granted on the alter ego issue and that 911 Management's motion be
13  denied.

14       D.  Propriety of the IRS in Conducting the Levy

15       As noted above, 911 Management contends in its fourth claim
16  that the IRS was required to issue a notice of deficiency and a
17  notice of intent to collect levy, to 911 Management, and not just
18  to the taxpayers.  911 Management's motion for summary judgment
19  appears to seek summary judgment on all of its claims, but 911
20  Management fails to mention this claim in its motion or in
21  opposition to defendant's motion.

22       The law allows the IRS to collect the unpaid taxes of a
23  taxpayer by levying on property held by third parties that are
24  nominees, alter-egos, or transferees of a taxpayer.  G.M. Leasing
25  Corp. v. United States, 429 U.S. 338, 350-51 (1977); Al-Kim, Inc.
26  v. United States, 650 F.2d 944, 947 (9th Cir. 1979).

27       Third parties are not required to receive notice of a bank
28  account levy.  E.g., Miller v. United States, 955 F. Supp. 795, 800

59 - FINDINGS & RECOMMENDATION/ORDER

(N.D. Ohio 1996) ("service of notice need not be made upon potential third party owners to satisfy the notice provisions of the federal tax law.") (internal quotation omitted); see also Douglas v. United States, 562 F. Supp. 593 (S.D. Ga. 1983) (in levying bank account, notice to bank as the possessor of the money in the account, was sufficient and notice was not required to nontaxpayer account co-holder); 26 C.F.R. § 301.6320-1(b)(2)Q-B5 (treasury regulation explaining notice requirements and in question and answer format, stating that the nominee is not entitled to "CDP" (Collection Due Process) hearing, following notice of federal tax lien, because the nominee is not the person who has refused to pay the tax owing); Sullivan v. Saenger, 152 Or. App. 46, 54, 952 P.2d 95, 99-100 (1998) (IRS did not need to provide notice regarding property seizure to alter ego because alter ego was, essentially, identical to the taxpayer, or stood in the shoes of the taxpayer, and thus, notice to the taxpayer alone was sufficient).

911 Management provides no law to support its position that the IRS was required to notify 911 Management of the Weatherses' tax deficiency and the IRS's intent to levy 911 Management's bank account. The law supports awarding summary judgment to defendant on 911 Management's fourth claim.

III.    Motion to Strike

911 Management moves to strike all, or part, thirty-two separate paragraphs contained in defendant's CSF filed in support of defendant's summary judgment motion, and all references to those alleged facts in defendant's motion and supporting memorandum. I address 911 Management's arguments by the type of objection.

A.  No Support in the Record

911 Management moves to strike paragraphs 26, 38, 40, 41 (first sentence only), 83, 86, and 87 (first sentence only) of defendant's CSF on the basis that the factual allegations are without support in the record.

a.  Paragraph 26

"911 Management LLC, was formed on October 25, 2005, 11 days after Thomas Weathers was sentenced in this criminal tax case." Deft's CSF at ¶ 26.  I deny the motion.  Defendant cites to 911 Management's application to form a limited liability company, which contains the October 25, 2005 date.  In a different part of the CSF, defendant cites to Tom Weathers's criminal judgment which reveals the date of sentencing.

b.  Paragraph 38

"Bruce Carroll, who was or is Thomas Weathers cell-mate in federal prison has 'received benefits' from Club Ed."  I deny the motion.  Dent's cited deposition testimony supports the assertion.

c.  Paragraph 40

"The gross receipts reported on 911 Management's 2006 and 2007 federal returns include amounts received by 911 Management based on the 'License Agreements' that relate to the Weathers' leases to operate the Joyce and Kent Hotels."  While I agree with 911 Management that defendant's citation to the License Agreements themselves does not support the assertion that the reported gross receipts listed on the tax returns included amounts based on the License Agreements that relate to the Oregon hotels, I deny the motion because 911 Management itself asserts in its CSF in support of its motion for summary judgment, that its sole source of income

61 - FINDINGS & RECOMMENDATION/ORDER

1  is the rental of the Oregon hotels and the Washington properties.

2  Pltf's CSF at ¶ 31 (citing to Dent Feb. 20, 2009 Affid. at ¶ 5).

3  This objection is pointless.

4                d.   Paragraph 41 (first sentence only)

5       "The gross receipts reported on 911 Management's 2006 and 2007

6  federal returns also include amounts 911 Management received due to

7  its purported management of the real properties in Longview,

8  Washington and Kelso, Washington."  I agree with 911 Management

9  that the cited deposition excerpts do not appear to mention the

10  source of the revenue on the tax returns.  However, as with the

11  previous objection to paragraph 40 of defendant's CSF, 911

12  Management itself asserts that its sole source of income is the

13  rental of the Oregon hotels and Washington properties.  Moreover,

14  911 Management also asserts in its own CSF that it had "verbal"

15  agreements[12] with the Weathers to operate the Washington properties.

16  Finally, this Court, in reviewing an asserted fact in a CSF,

17  routinely makes no reference to surplus verbiage such as the word

18  "purport."  I deny the motion.

19                e.   Paragraph 83

20       "The Weathers purport to permit 911 Management to operate the

21  real properties they own in Longview, Washington and Kelso,

22  Washington."  Because the cited evidence by defendant supports this

23  assertion, I can only assume that 911 Management objects to the use

24  of the word "purport."  For the reason explained in the preceding

25

26       [12]  I assume 911 Management means it had an oral agreement

27  with the Weatherses.  "Verbal" refers to the use of words,

    whether written or oral.  Bryan A. Garner, A Dictionary of Modern

28  Legal Usage 910-11 (2d ed. 1995).

paragraph, I deny the motion.

f.  Paragraph 86

"Dent has deposited funds due to 911 Management into the bank of another entity (*i.e.*, 411 Services, LLC), to foil IRS collection efforts and Dent signed a document on behalf of 911 Management and 411 Services, LLC, purporting to make 411 Services a fiduciary of 911 Management."  Because I do not rely on the evidence underlying this asserted fact in resolving the motions, I deny the motion as moot.

g.  Paragraph 87

"Dan Dent sent Jeff Townley an e-mail on January 30, 2008 which stated that, 'to get all of our ducks in order' in light of the pending case with the United States, Dent would 'need' promissory notes for certain purported loans that had already been made."  I deny the motion because the cited evidence generally supports the assertion and although defendant slightly changed the language in the email, I relied solely on the email itself, not defendant's articulation of it.

B.  Argumentative, Unsupported, and Immaterial

911 Management moves to strike the following paragraphs in defendant's CSF:  10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 28, 32, 44, 63, 64, 65, 66, and 67 because the asserted facts are allegedly argumentative, unsupported, and immaterial.

Because of the number of paragraphs involved, I do not quote them all here.  Generally, the assertions in these paragraphs address background facts about the Weatherses, including (1) facts regarding the rents received on the properties they owned in 1993 through 1996 as reflected in their tax returns for those years;

Deft's CSF at ¶¶ 10, 11; (2) facts about their amended return for 1996 and statements made to the IRS about whether they owed tax for that year; Deft's CSF at ¶¶ 12, 14, 15; (3) facts regarding the criminal indictment, the superseding indictment, the convictions, the sentences received by Kathy and Tom Weathers; Deft's CSF at ¶¶ 16-23; (4)  facts as to Kathy Weathers's probation violation in 2007; Deft's CSF at ¶¶ 25-26; (5) certain facts about 911 Management's formation; Deft's CSF at ¶ 26; (6) certain facts about Bryce Townley's involvement in 911 Management's formation and his litigation in an unrelated case involving transfers of property to an alter ego/nominee; Deft's CSF at ¶¶ 27, 28; (7) facts as to the limited partners of T&K Weathers, LLP; Deft's CSF at ¶ 32; (8) the fact Dent visits Tom Weathers in prison about once each month; Deft's CSF at ¶ 44; (9) facts regarding correspondence between Tom Weathers or Dent and the real estate attorney for D.Z. Real Estate regarding the Joyce Hotel; Deft's CSF at ¶¶ 63-66; and (10) the fact that Dent allegedly acted as an intermediary for Tom Weathers regarding the Joyce Hotel Lease negotiations.  Deft's CSF at ¶ 67.

I deny the motion as to the following paragraphs because the evidence cited in support of the asserted facts is material to the disposition of the motions, the asserted fact is sufficiently supported, and the Court has ignored any language in the assertion that is not the fact itself:  Paragraphs 10-12, 14, 17-20, 22, 23, 26, 27, 32, 44, 63, 64.  I deny the motion as moot as to the following paragraphs because I did not rely on the cited evidence in resolving the motions:  15, 16, 21, 24, 25, 28, 65-67.

C.  Redundant, Immaterial, Impertinent, or Scandalous

911 Management moves to strike the following paragraphs of

64 - FINDINGS & RECOMMENDATION/ORDER

1    defendant's CSF because, according to 911 Management, these
2    assertions are not relevant to the issues raised in the motions and
3    are offered solely for the purpose of disparaging the Weatherses
4    and through affiliation with the Weatherses, 911 Management: 14-
5    16, 24, 28, and 62.

6        The only paragraph not previously addressed is paragraph 62.
7    There, defendant makes an assertion regarding a net worth statement
8    submitted by Kathy Weathers as part of her probation. I deny the
9    motion as moot because I did not rely on the underlying evidence in
10   resolving the motions.

11       D. Not Produced in Discovery

12       Plaintiff challenges the facts asserted in paragraphs 28 and
13   73 of defendant's CSF because the underlying evidence was not
14   produced in discovery. I have already addressed paragraph 28.
15   Paragraph 73 asserts that Jeff Townley was previously adjudged in
16   an unrelated civil case to be a nominee of a taxpayer. I deny the
17   motion as moot because I did not rely on the underlying evidence in
18   resolving the motion.

19       Finally, the Court admonishes 911 Management and its counsel
20   that a motion to strike is not properly addressed to statements by
21   counsel, meaning assertions of fact in a CSF or arguments made in
22   a memorandum of law. Motions to strike in the summary judgment
23   context should be directed to the actual evidence, as there is no
24   basis to strike a lawyer's description of the facts contained in a
25   CSF assertion or to strike a lawyer's argument in support of an
26   inference the lawyer wishes the Court to draw. Motions directed to
27   a CSF assertion or to an argument about the meaning of a fact are
28   a waste of the Court's time.

65 - FINDINGS & RECOMMENDATION/ORDER

CONCLUSION

Defendant's motion for summary judgment (#52) should be granted. 911 Management's motion for summary judgment (#57) should be denied. 911 Management's motion to strike (#71) is denied in part and denied as moot in part.

SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due September 8, 2009. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due September 22, 2009. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this __24th__ day of __August_____, 2009.


_____/s/ Dennis James Hubel_____
Dennis James Hubel
United States Magistrate Judge